Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 30, 2004　　　　Decided June 11, 2004

No. 03-1085

TAREK H. JIFRY AND MAAN H. ZARIE,
PETITIONERS

v.

FEDERAL AVIATION ADMINISTRATION, ET AL.,
RESPONDENTS

———

Consolidated with Nos.
03-1143, 03-1144, 03-1282

———

On Petitions for Review of an Order of the
Federal Aviation Administration

———

*Thomas J. Whalen* argued the cause for petitioners. With him on the briefs was *Evelyn D. Sahr*.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Douglas N. Letter*, Attorney, U.S. Department of Justice, argued the cause for respondents. With him on the brief were *Peter D. Keisler*, Assistant Attorney General, and *E. Roy Hawkens* and *Catherine Y. Hancock*, Attorneys.

Before: ROGERS, TATEL and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: Petitions filed by two non-resident alien pilots challenge certain aviation regulations adopted in the wake of the September 11, 2001 terrorist attacks. From the establishment of the Transportation Security Administration ("TSA") in November 2001 to the promulgation of the challenged regulations in January 2003, aviation security has undergone a fundamental transformation. The pilots contend that the new procedures resulting in the revocation of their airman certificates issued by the Federal Aviation Administration ("FAA") violated the Administrative Procedure Act ("APA") and the due process clause of the Fifth Amendment to the United States Constitution. Specifically, they contend that the January 2003 regulations were unlawfully promulgated without notice and comment, that the revocations were not supported by substantial evidence in the record, and that they were denied meaningful notice of the evidence against them and a meaningful opportunity to be heard.

## I.

Congress has delegated broad discretion to the Federal Aviation Administration ("FAA") to prescribe regulations and standards for safety in air commerce and national security. *See* 49 U.S.C. § 44701(a)(5). The FAA may "at any time" reexamine the issuance of an airman certificate and issue an order "modifying, suspending, or revoking" a certificate if the Administrator determines that such action is required for "safety in air commerce" and "the public interest." 49 U.S.C. §§ 44709(a), (b). With regard to issuing airman certificates to qualified individuals, Congress distinguished between citizens and aliens, conferring broad discretion to the FAA regarding alien pilots. *See id.* § 44703(e). After the Septem-

ber 11, 2001 terrorist attacks, Congress established the Transportation Security Administration ("TSA") on November 19, 2001, and transferred much of the responsibility for civil aviation security from the FAA to the TSA. *See id.* §§ 114(d), (f).

This case concerns alien pilots only; citizens and resident alien pilots have challenged the applicable regulations in *Coalition of Air Line Pilots Ass'ns. v. FAA,* Nos. 03–1074 and 03–1076 (D.C. Cir. June 11, 2004). The two pilots, Jifry and Zarie, are citizens of Saudi Arabia who have used their FAA certificates to pilot flights abroad, but have not operated Saudi Arabian Airlines flights to the United States in the past nine and four years, respectively. On August 14, 2002, the TSA sent letters to the FAA requesting that Captain Jifry and Captain Zarie have their airman certificates revoked, stating that "[b]ased upon information available to us," they presented "a security risk to civil aviation or national security." The FAA notified Jifry and Zarie by letters of August 20, 2002, that their airman certificates would be revoked because the Acting Under Secretary of Transportation for Security, pursuant 49 U.S.C. §§ 44709(b)(1)(A) and 46105(c), had determined that they presented risks to aviation or national security. The FAA revoked the pilots' certificates, *see* 49 U.S.C. § 44709(b), and the pilots appealed the revocations to the National Transportation Safety Board ("NTSB"). *Id.* § 44709(d). An administrative law judge ("ALJ") held a telephonic pre-hearing conference on January 17, 2003, and ordered that the FAA and the TSA provide a privilege log and that depositions of key witnesses take place by mid-February.

A week later, on January 24, 2003, the FAA dismissed the revocation actions against Jifry and Zarie, and in conjunction with the TSA, published, without notice and comment, new regulations governing the suspension and revocation of airman certificates for security reasons. *See* 14 C.F.R. § 61.18, 49 C.F.R. § 1540.117. The new FAA regulation, 14 C.F.R. § 61.18, provides for automatic suspension by the FAA of airman certificates upon written notification from the TSA that the pilot poses a security threat and, therefore, is not eligible to hold an airman certificate. The TSA simultaneous-

ly promulgated 49 C.F.R. § 1540.117, which establishes the procedure by which the TSA initially and finally notifies non-resident aliens who hold or apply for FAA certificates that they pose a security threat, and requires the TSA to notify the FAA once the TSA has determined that a pilot is a security threat. Upon finding that a pilot poses a "security threat," *see* 49 C.F.R. § 1540.117(c), the TSA Assistant Administrator for Intelligence issues an Initial Notification of Threat Assessment ("Initial Notice") to the individual and serves that determination upon the FAA. *See id.* § 1540.117(e). The FAA then suspends the pilot's certificate. *See* 14 C.F.R. § 61.18(b)(2). No later than 15 days after service, the pilot may make a written request for copies of releasable materials upon which the Initial Notice was based. *See* 49 C.F.R. § 1540.117(e)(1) & (2). The TSA must respond not later than 30 days after receiving the request, and the pilot may submit a written reply within 15 days of receiving the TSA's response. *See id.* § 1540.117(e)(3) & (4). At that point, the TSA Deputy Administrator must review the entire record *de novo* to determine if the pilot poses a security risk. *Id.* § 1540.117(f)(1). If the Deputy so determines, the TSA serves a Final Notification of Threat Assessment ("Final Notice"), *id.* § 1540.117(f)(2), and the FAA revokes the certificate. *See* 14 C.F.R. § 61.18(c)(2). The pilot may appeal the certificate revocation to the NTSB. *See* 49 U.S.C. § 44709(d). Upon exhaustion of these administrative remedies, the pilot may seek review in the court of appeals, which may review the case on the merits. *See id.* §§ 44709(f), 46110.

On January 24, 2003, the TSA also served an Initial Notice of Threat Assessment designating Jifry and Zarie as security threats, and the FAA suspended their certificates. The pilots appealed the Initial Notice, and requested the materials upon which the Initial Notice had been issued. The TSA provided the releasable materials, but did not include the factual basis for TSA's determination, which was based on classified information. The pilots then appealed the suspension of their certificates to the NTSB. The ALJ granted the TSA's motion for summary judgment, ruling that the only question

was procedural – whether the pilots had been duly advised by the TSA, in writing, that they posed a security threat, and finding that they had. Upon the pilots' appeals, the NTSB affirmed the ALJ's order in favor of the TSA. Jifry and Zarie then filed replies to the TSA's Initial Notice, stating that the "lack of evidence and information about the basis for the determination contained in the TSA's response" made it impossible for them to specifically rebut the TSA's allegations, and denying that they were security threats. On May 8, 2003, the TSA Deputy Administrator, upon *de novo* review of the administrative record, denied the pilots' challenge to the Initial Notice and issued a Final Notice based on finding that Jifry and Zarie posed security threats. *See* 49 C.F.R. § 1540.117(c). The FAA then revoked the pilots' airman certificates. On August 13, 2003, the NTSB denied the pilots' appeal of the revocation of their certificates for the same reasons it had denied their challenges to the suspensions, and affirmed the ALJ's grant of summary judgment to the TSA and the emergency orders of revocation.

## II.

The pilots make three challenges to the revocations of their FAA airman certificates: first, that the January 2003 regulations were unlawfully promulgated without notice and comment; second, that the revocations were not supported by substantial evidence in the record; and third, that the procedures provided by the January 2003 regulations violated their due process rights under the Fifth Amendment to the Constitution. We address each in turn.

Section 553 of the Administrative Procedure Act ("APA") requires an agency to publish a general notice of proposed rulemaking and to afford an opportunity for interested persons to participate in the rulemaking. *See* 5 U.S.C. § 553(b), (c). The "good cause" exception, however, provides that "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest," the agency need not engage in notice and comment. *Id.* § 553(b)(3)(B). The pilots con-

tend that the regulations of January 2003 are invalid because they were unlawfully promulgated without notice and comment, and there was no rational basis for eliminating the right to a meaningful appeal before the NTSB. They maintain that the "good cause" exception does not apply because notice and comment had not been "impracticable, unnecessary or contrary to the public interest" inasmuch as the FAA already had the authority to immediately suspend or revoke a certificate upon finding that "safety in air commerce or air transportation and the public interest" required such an action. *See* 49 U.S.C. § 44709, *amended by* Pub. L. No. 108–176, 117 Stat. 2490 (2003).

Contrary to the position of respondents TSA, FAA, and the NTSB, the pilots' APA challenges to the FAA regulation, 49 C.F.R. § 61.18, are not mooted by the enactment of the Vision 100 – Century of Aviation Reauthorization Act ("Act"), 49 U.S.C. § 46111, on December 12, 2003. The Act provides that the FAA Administrator "shall issue an order . . . suspending, or revoking any part of a certificate . . . if the Administrator is notified by the Under Secretary for Border Transportation Security of the Department of Homeland Security that the holder of the certificate poses, or is suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety." 49 U.S.C. § 46111(a). The respondents maintain that through § 46111, Congress approved the certificate-revocation process embodied in the FAA regulation by expressly commanding the FAA to suspend or revoke certificates if requested by the TSA. The respondents have not shown a lack of a live controversy, however, because the effects of 14 C.F.R. § 61.18 remain very real for non-resident alien pilots like Jifry and Zarie. The FAA has applied this regulation against the two pilots, and it remains in effect notwithstanding the Act. The pilots therefore retain "a legally cognizable interest in the outcome," *Powell v. McCormack*, 395 U.S. 486, 496 (1969), of their APA claims.

Generally, the "good cause" exception to notice and comment rulemaking, *see* 5 U.S.C. § 553(b)(3)(B), is to be "narrowly construed and only reluctantly countenanced." *Ten-*

*nessee Gas Pipeline Co. v. FERC,* 969 F.2d 1141, 1144 (D.C. Cir. 1992) (quoting *New Jersey v. EPA,* 626 F.2d 1038, 1045 (D.C. Cir. 1980)). The exception excuses notice and comment in emergency situations, *Am. Fed'n of Gov't Employees v. Block,* 655 F.2d 1153, 1156 (D.C. Cir. 1981), or where delay could result in serious harm. *See Hawaii Helicopter Operators Ass'n v. FAA,* 51 F.3d 212, 214 (9th Cir. 1995). The latter circumstance is applicable here in examining the TSA's determination that "[t]he use of notice and comment prior to issuance of th[e] [January 2003 regulations] could delay the ability of TSA and the FAA to take effective action to keep persons found by TSA to pose a security threat from holding an airman certificate," and was "necessary to prevent a possible imminent hazard to aircraft, persons, and property within the United States."

The pilots contend that the "good cause" exception does not apply because the FAA already had unlimited power to revoke a certificate immediately if it believed an airman to be a security risk, *see* 49 U.S.C. § 44709, and the TSA was already authorized to make security assessments under 49 U.S.C. § 114(f). While true, the pilots fail to acknowledge that at the time the challenged regulations were adopted, the FAA's power to suspend or revoke certificates was permissive only. *See* 49 U.S.C. § 44709. Congress had not yet enacted 49 U.S.C. § 46111, which formalized the requirement that the FAA shall suspend, modify, or revoke a certificate if notified by the TSA that an individual posed a security risk. As the respondents explain, the January 2003 regulations mandated a "streamlined process" by which an individual's pilot certificate would be automatically suspended or revoked by the FAA upon notification by the TSA that a pilot posed a security threat. The TSA and FAA deemed such regulations necessary "in order to minimize security threats and potential security vulnerabilities to the fullest extent possible." Given the respondents' legitimate concern over the threat of further terrorist acts involving aircraft in the aftermath of September 11, 2001, *see* Declaration of TSA Deputy Administrator Stephen McHale (hereinafter McHale Decl.) at 4, the agencies had "good cause" for not offering advance public partic-

ipation. *See Utility Solid Waste Activities Group v. EPA*, 236 F.3d 749, 754–55 (D.C. Cir. 2001).

On the merits, the pilots' APA challenge fails. The court's review of agency rulemaking is highly deferential, limited to determining "whether the agency has considered the relevant factors and articulated a 'rational connection between the facts found and the choice made.'" *United States Air Tour Ass'n v. FAA*, 298 F.3d 997, 1005 (D.C. Cir. 2002) (quoting *Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). In *BellSouth Corp. v. FCC*, 162 F.3d 1215, 1221 (D.C. Cir. 1999), the court observed that "[w]hen . . . an agency is obliged to make policy judgments where no factual certainties exist or where facts alone do not provide the answer, [the reviewing court's] role is more limited; we require only that the agency so state and go on to identify the considerations it found persuasive."

Contrary to the pilots' position, the regulations are not arbitrary and capricious for bearing no rational connection to the problem identified by the FAA. It is self-evident that the regulations are related to the TSA's and FAA's goals of improving the safety of air travel. Nor is the court in a position to second-guess the respondents' judgment that imposing stricter procedures for coordinating security risks and restricting individuals who pose security threats from holding airman certificates was necessary to further that goal. *See BellSouth Corp. v. FCC*, 162 F.3d at 1221–22. Moreover, the pilots' contention that the risk posed by the certificate holders alleged to be security threats was not remedied by providing fewer procedural protections to the certification holders and narrowing their right to NTSB review is to no avail because 49 U.S.C. § 46111 produces the same result. Section 46111 makes no provision for NTSB review even for citizens, and the Conference Report states that non-resident aliens "have the right to the appeal procedures that [TSA] has already provided for them." H.R. Conf. Rpt. 108–334 at 152 (2003). In addition, § 46111(a) requires the FAA to respond automatically to TSA threat assessments, providing that the FAA "shall issue an order amending, modifying, suspending, or revoking any part of a certificate issued under this title if the

Administrator is notified by . . . the Department of Homeland Security that the holder of the certificate poses, or is suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety." 49 U.S.C. § 46111(a). Accordingly, if these pilots retain any right to NTSB review at all, it is no broader than the review for procedural regularity that they have received, and they would therefore garner no benefit from a remand. Indeed, an additional ground for rejecting the pilots' challenge to the promulgation of the FAA regulation without notice and comment exists precisely because § 46111 now provides an express statutory authorization for the automatic revocation that was previously predicated on the regulations alone; even were the court to invalidate the regulations for lack of notice and comment, the statute would compel the FAA to honor the TSA's notification and take immediate action against the pilots' certificates.

## III.

The scope of the court's review of the pilots' challenges to the TSA's actions is limited to determining whether the actions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Under this standard, the court must consider whether those actions were "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416 (1971) (*overruled on other grounds*). *See Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983). The court must affirm the agency's findings of fact if they are supported by "substantial evidence" and there is a "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168 (1962). "Substantial evidence" is simply such relevant evidence as a reasonable person might accept as proof of a conclusion. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1981) (quoting *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938)).

In contending that the revocations of their airman certificates are unsupported by substantial evidence in the record, the pilots do not challenge the definition of "security threat" under the TSA regulations. An individual poses a "security threat" if the individual "is suspected of posing, or is known to pose (1) A threat to transportation or national security; (2) A threat to air piracy or terrorism; (3) A threat to airline or passenger security; or (4) A threat to civil aviation security." 49 C.F.R. § 1540.117(c). Consistent with *Camp v. Pitts*, 411 U.S. 138, 143 (1973), where the Supreme Court stated that when an agency official fails to adequately explain its decision, the agency should submit "either through affidavits or testimony, such additional explanation of the reasons for the agency decision as may prove necessary," the affidavit of TSA Deputy Administrator Stephen McHale provides an adequate basis for the TSA's determination that Jifry and Zarie each posed a "security threat" within the meaning of § 1540.117(c). The unsealed affidavit recounts that the Deputy Administrator affirmed the TSA's determination on the basis of classified intelligence reports, combined with reports from the intelligence community that aircraft would continue to be used as weapons of terrorism, and consideration of "the ease with which an individual may obtain access to aircraft in the United States once he or she has a pilot license." McHale Decl. at 4. The Deputy Administrator attested that "because it would be very difficult to avert harm once a terrorist had control of an aircraft, I concluded that it was important to err on the side of caution in determining whether [the two pilots] . . . pose a security threat. . . ." *Id.* at 4–5.

Viewing as a whole the record evidence before the TSA, including *ex parte in camera* review of the classified intelligence reports, we hold that there was substantial evidence to support the TSA's determination that the pilots were security risks. While we reject the pilots' contention that the court apply a *de novo* standard of review, we have carefully reviewed the classified intelligence reports on which TSA relied. The record is not lengthy and the basis for the TSA's conclusion is obvious. The court's review is limited, moreover, to the administrative record that was before the TSA

when it determined that the pilots were security risks. *See* 5 U.S.C. § 706; *cf. United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 715 (1963). Hence, the pilots' post-argument submission of May 3, 2004 is not properly before the court, although we note that the information it contains was known to the pilots in 2001 and could have, and still can be, submitted to the TSA.

The pilots' motion to bar the respondents' reliance on classified information in this court is not well-taken. Even assuming the respondents' failure to provide notice of its intention to rely on classified information on appeal until one month after the pilots filed their opening brief prevented the pilots from timely addressing the "classified information" question in their opening brief, the pilots' motion fails on its merits for several reasons. First, because the court reviewed the information designated by the respondents as "classified," the court is in a position to determine whether it was properly classified without the *Vaughn* Index, *see Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir. 1973), that the pilots urge be obtained. Reliance on *Vaughn* is misplaced, in any event, because that case involved the Freedom of Information Act and presented a very different situation than that presented here. Second, the court has inherent authority to review classified material *ex parte, in camera* as part of its judicial review function. *See Molerio v. FBI*, 749 F.2d 815, 822 & n.2 (D.C. Cir. 1984). *See also Holy Land Found. v. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 164 (D.C. Cir. 2003); *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 208–09 (D.C. Cir. 2001). The pilots' focus on the TSA Deputy Administrator's reliance on "sensitive security information," as defined by 49 U.S.C. §§ 114(s), 40119(b)(1), and 49 C.F.R. Part 1520, and "law enforcement sensitive" information, *see* McHale Decl. at 5, fares no better. Although 49 C.F.R. § 1520.5(b) provides that a person has a "need to know sensitive security information" when the information is necessary to represent an individual in a judicial or administrative proceeding, § 1520.5(b)(5) applies only to individuals representing persons listed in § 1520.5(a), and the pilots are not among the persons listed in subsection (a) who are required

to restrict disclosure of and access to sensitive security information to those with a "need to know." *See* 49 C.F.R. § 1520.5(a).

**IV.**

The court reviews *de novo* the pilots' challenge to the constitutionality of the procedures under the January 2003 regulations. *See Vt. Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 543 (1978); *Ramirez-Alejandre v. Ashcroft,* 319 F.3d 365, 377 (9th Cir. 2003); *Grace Towers Tenants Ass'n v. Grace Housing Dev. Fund Co.,* 538 F.2d 491, 496 (2d Cir. 1976). They contend that the TSA and FAA procedures violate the Fifth Amendment of the Constitution by depriving the pilots of their property interest in their airman certificates without due process of law.

The Supreme Court has long held that non-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections. *See Johnson v. Eisentrager,* 339 U.S. 763, 771 (1950); *Yamataya v. Fisher,* 189 U.S. 86, 101 (1903); *Yick Wo v. Hopkins,* 118 U.S. 356, 369 (1886). *See also United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 318 (1936); *Pauling v. McElroy,* 278 F.2d 252, 253 n.3 (D.C. Cir. 1960). *Cf. United States v. Verdugo–Urquidez,* 494 U.S. 259, 261 (1990). Exceptions may arise where aliens have come within the territory of the United States and established "substantial connections" with this country, *Verdugo–Urquidez,* 494 U.S. at 271, or "accepted some societal obligations." *Id.* at 273. In such situations, the Court has recognized that aliens may be accorded protections under the Constitution. *See Plyler v. Doe,* 457 U.S. 202, 211–12 (1982); *Kwong Hai Chew v. Colding,* 344 U.S. 590, 596 (1953); *Russian Volunteer Fleet v. United States,* 282 U.S. 481, 489 (1931). This court has applied these principles in a series of cases concerning the designation of certain dissident organizations as "foreign terrorist organization[s]." *See People's Mojahedin Org. of Iran v. Dep't of State,* 327 F.3d 1238, 1241 (D.C. Cir. 2003) ("*People's Mojahedin II*"); *Nat'l Council,* 251 F.3d at 201; *People's Mojahedin Org. of Iran v. Dep't*

*of State,* 182 F.3d 17, 22 (D.C. Cir. 1999) ("*People's Mojahedin I*"). *See also 32 County Sovereignty Comm. v. Dep't of State,* 292 F.3d 797, 799 (D.C. Cir. 2002). In *People's Mojahedin I,* 182 F.3d at 22, the court explained that "[a] foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise." We need not decide whether or not Jifry and Zarie are entitled to constitutional protections because, even assuming that they are, they have received all the process that they are due under our precedent.

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552 (1965)). Generally, in determining whether administrative procedures are constitutionally adequate, courts weigh three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews,* 424 U.S. at 335. The pilots' interests at stake here – their interest in possessing FAA airman certificates to fly foreign aircraft outside of the United States – pales in significance to the government's security interests in preventing pilots from using civil aircraft as instruments of terror. As the Supreme Court has noted, "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation." *Haig v. Agee,* 453 U.S. 280, 307 (1981) (quoting *Aptheker v. Secretary of State,* 378 U.S. 500, 509 (1964)). Whatever the risk of erroneous deprivation, the pilots had the opportunity to file a written reply to the TSA's initial determination and were afforded independent *de novo* review of the entire administrative record by the Deputy Administrator of the FAA, *see* 49 C.F.R. § 1540.117(e)(4), (f),

and *ex parte, in camera* judicial review of the record. In light of the governmental interests at stake and the sensitive security information, substitute procedural safeguards may be impracticable, and in any event, are unnecessary under our precedent.

In *National Council*, 251 F.3d at 208, the court concluded that in designating organizations as foreign terrorist organizations under the Anti–Terrorism and Effective Death Penalty Act, the Secretary of State had to "afford to the entities under consideration notice that the designation is impending," *id.*, and "the opportunity to present, at least in written form, such evidence as those entities may be able to produce to rebut the administrative record or otherwise negate the proposition that they are foreign terrorist organizations." *Id.* at 209. In light of the Supreme Court's instruction that "due process is flexible and calls for such procedural protections as the particular situation demands," *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972), the court held that because of the extent to which security concerns were implicated in that case, the Secretary could upon "adequate showing to the court," provide the requisite notice after the designation of the organization as a terrorist organization, and needed only to disclose the unclassified portions of the record. *National Council*, 251 F.3d at 208. In *People's Mojahedin II*, 327 F.3d at 1242–43, another case involving the designation of terrorist organizations, the court underscored that it "had established in [*National Council*] the process which is due under the circumstances of this sensitive matter of classified intelligence in the effort to combat foreign terrorism," and that "nothing further is due." *Id. See also Holy Land*, 333 F.3d at 163–64.

The TSA Assistant Administrator's Initial Notices informed the pilots that "[b]ased upon materials available to the [TSA], which I have personally reviewed, I have determined that you pose a security threat." The pilots were afforded an opportunity to respond to the designation and both filed written challenges to the TSA's Initial Notice, along with affidavits that they did not pose a threat to aviation or national security. *See* 49 C.F.R. § 1540.117(e)(4). These materials were considered by the TSA Deputy Administrator when he con-

ducted a *de novo* review of the administrative record before issuing the Final Notice. While the pilots protest that without knowledge of the specific evidence on which TSA relied, they are unable to defend against the charge that they are security risks, the court has rejected the same argument in the terrorism listing cases. The due process protections afforded to them parallel those provided under similar circumstances in *National Council* and *People's Mojahedin II*, and are sufficient to satisfy our case law.

Accordingly, we affirm the NTSB revocation order of August 13, 2003, and deny the petitions for review and the pilots' motion to bar the respondents' reliance on classified information.