# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued May 13, 2014           Decided June 20, 2014

No. 13-1122

SORENSON COMMUNICATIONS INC. AND CAPTIONCALL, LLC,
PETITIONERS

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

———

Consolidated with 13-1246

———

On Petitions for Review of Orders of
the Federal Communications Commission

———

*Christopher J. Wright* argued the cause for petitioners. With him on the brief were *John T. Nakahata* and *Timothy J. Simeone*.

*Mark D. Schneider* was on the brief for *amici curiae* Hearing Loss Association of America, et al. in support of petitioners.

*C. Grey Pash Jr.*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *Jonathan B. Sallet*, Acting General Counsel,

and *Jacob M. Lewis*, Associate General Counsel. *Robert B. Nicholson*, Attorney, U.S. Department of Justice, *Finnuala K. Tessier*, Trial Attorney, and *Richard K. Welch*, Deputy Associate General Counsel, Federal Communications Commission, entered appearances.

Before: BROWN, GRIFFITH and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* BROWN.

BROWN, *Circuit Judge*.  The word "captioning" typically conjures up an image of a television set with black bars scrolling at the bottom, transcribing a speaker's words with varying degrees of accuracy.  For hearing-impaired individuals, however, it may also evoke the image of something else:  telephones that have words scrolling on a screen during a call.

Sorenson Communications is a purveyor of these devices; its technology uses the Internet to transmit and receive both the call itself and the derived captions.  Departing from common industry practice, the company gives its phones out for free, with the captioning feature turned on.  The Federal Communications Commission, concerned about a dramatic spike in costs correlated with these tactics, hurriedly promulgated rules clamping down on both practices.  After bypassing the notice and comment process for the interim rules, the FCC considered input from various stakeholders before finalizing an amended version of the rules.  Sorenson now challenges the two rules, claiming they violate the Americans with Disabilities Act of 1990 and the Administrative Procedure Act.  The company also asserts the Commission had no legal basis for skipping core rulemaking steps in its hurry to set forth the rules.  We agree with most of

Sorenson's arguments and therefore grant its petitions for review.

I

Title IV of the Americans with Disabilities Act of 1990 requires the Federal Communications Commission ("FCC" or "the Commission") to arrange for telecommunications relay services (TRS) that are "functionally equivalent to the ability of a hearing individual who does not have a speech disability." 47 U.S.C. §§ 225(a)(3), 225(b)(1). To carry out this directive, the FCC created a TRS Fund, collecting contributions from common carriers and other communications companies. *See* 47 C.F.R. § 64.604(c)(5)(iii)(A). The Commission uses this Fund to compensate TRS providers for their services; rates range from $1.2855 per minute to $6.2390 per minute, depending on the kind of service provided.

One type of TRS service is the Internet Protocol Captioned Telephone Service (IP CTS), which uses the Internet to transmit phone conversations and captioned messages between hearing-impaired users, third-party callers, and relay operators. *See generally* FED. COMMC'NS COMM'N, Internet Protocol (IP) Captioned Telephone Service, *available at* https://www.fcc.gov/guides/internet-protocol-ip-captioned-telephone-service. IP CTS providers are compensated at a rate of $1.7877 per minute, and prior to the rulemakings at issue, they served a population of about 150,000 users.

Sorenson Communications is an IP CTS provider. Unlike its competitors, who generally require their users to

purchase a phone,[1] Sorenson provided its phones to customers at no charge. This led to the belief that Sorenson's unusual method of expanding its market presence resulted in a strain on the TRS fund, with actual disbursements to providers far exceeding projected amounts.

On January 25, 2013, the FCC released an Interim Order, without notice and comment, promulgating several interim rules. *Misuse of Internet Protocol (IP) Captioned Telephone Service* ("Interim Order"), 28 F.C.C. Rcd. 703 (2013). It cited the potential for Fund depletion caused by IP CTS misuse as "good cause" for bypassing the notice-and-comment requirements of the Administrative Procedure Act (APA). *Id.* at 703 ¶ 1. Of the rules promulgated in the Interim Order, two are pertinent to this appeal. First, the Commission required all new users to register and self-certify their hearing loss, but only if the provider sold the IP CTS equipment for $75 or more. If the phone was distributed for free or for less than $75, the FCC required users to submit third-party professional certification of their hearing impairment. *Id.* at 718–19 ¶¶ 24, 25. Second, all IP CTS capable phones were to be distributed with the captions turned off; users were to activate the captioning feature for each call as needed. *Id.* at 722 ¶ 33. Commissioner Pai dissented in part, questioning whether self-certification would actually deter fraud and misuse. Sorenson petitioned for review of the Interim Order on April 8, 2013.

The FCC issued a Final Order on August 26, 2013, which made permanent—after notice and comment—most of the rules promulgated in the Interim Order. *Misuse of Internet Protocol (IP) Captioned Telephone Service* ("Final Order"),

---

[1] Certain income-eligible users can receive low-cost or no-cost equipment through state-run programs. These phones are not at issue in this case.

28 F.C.C. Rcd. 13,420 (2013). It tweaked the price-floor rule, eliminating the option to be certified by a third-party professional; instead, all phones were to cost $75 or more to be eligible for TRS reimbursement, unless the phone was distributed through a state-run program ("the $75 Rule"). As for the default captions rule, the Commission added an exception: all IP CTS-capable phones were to be distributed with captions turned off by default, *unless* the user applied for an exemption based on a certification by an independent professional that the user was either too physically or mentally disabled to turn captions on manually ("the Default-Off Rule"). Sorenson petitioned this court for review of the Final Order on September 6, 2013.

II

We begin by examining whether the Commission had good cause for bypassing notice and comment in promulgating the Interim Order.[2] An agency can bypass the notice-and-comment requirement of the APA when it "for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(3)(B).

But first, the standard of review. We have never expressly articulated the scope of our review in evaluating an

---

[2] Although the Final Order has superseded the Interim Order, Sorenson's challenge to the latter is not moot. The company's failure to comply with the terms of the Interim Order resulted in it being denied compensation for its provision of IP CTS services. *See* Oral Arg. Tr. at 12:17–25. Sorenson's provider compensation is a "legally cognizable interest in the outcome," *see Larsen v. U.S. Navy*, 525 F.3d 1, 3–4 (D.C. Cir. 2008), and vacatur would provide an "effective remedy," *see Conservation Force, Inc. v. Jewell*, 733 F.3d 1200, 1204 (D.C. Cir. 2013).

agency's invocation of good cause. The Commission claims it is entitled to some measure of deference. We are not persuaded.

To accord deference would be to run afoul of congressional intent. From the outset, we note an agency has no interpretive authority over the APA, *see Envirocare of Utah, Inc. v. NRC*, 194 F.3d 72, 79 n.7 (D.C. Cir. 1999); we cannot find that an exception applies simply because the agency says we should. Moreover, the good-cause inquiry is "meticulous and demanding." *N.J. Dep't of Envt'l Protection v. EPA*, 626 F.2d 1038, 1046 (D.C. Cir. 1980). Our caselaw indicates we are to "narrowly construe[]" and "reluctantly countenance[]" the exception. *See Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (citations omitted). Deference to an agency's invocation of good cause— particularly when its reasoning is potentially capacious, as is the case here—would conflict with this court's deliberate and careful treatment of the exception in the past. Therefore, our review of the agency's legal conclusion of good cause is *de novo*.[3]

The Commission suggests notice and comment were impracticable. Impracticability is an "inevitably fact-or-context dependent" inquiry. *See Mid-Tex Elec. Coop. v. FERC*, 822 F.2d 1123, 1132 (D.C. Cir. 1987). In the past, we have approved an agency's decision to bypass notice and comment where delay would imminently threaten life or physical property. *See, e.g.*, *Jifry v. FAA*, 370 F.3d 1174, 1179 (D.C. Cir. 2004) (upholding assertion of good cause when rule was "necessary to prevent a possible imminent

---

[3] Of course, we defer to an agency's factual findings and expert judgments therefrom, unless such findings and judgments are arbitrary and capricious.

hazard to aircraft, persons, and property within the United States"); *Council of the S. Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981) (noting the case was one of "life-saving importance" involving miners in a mine explosion); *see also Jifry*, 370 F.3d at 1179 (observing the good-cause exception should be invoked only in "*emergency* situations . . . or where delay could result in serious harm" (emphasis added)). This is no such case.

The Commission cited—and continues to cite—the threat of impending fiscal peril as cause for waiving notice and comment. Curiously, however, there were no factual findings supporting the reality of the threat. Instead, the agency speculatively stated "absent Commission action, there *could* be insufficient funds available . . . to meet the needs of the Fund." *Interim Order*, 28 F.C.C. Rcd. at 707 (emphasis added). Commissioner Pai, dissenting in part from the Commission's decision, helped fill in some of the blanks: $128 million had been allocated and collected for the 2012-2013 fiscal year, but the Fund had already paid out $70 million within the first six months. *See id.* at 750–51. This, he explained, would have created an unsustainable payout rate, leaving the Fund with obligations somewhere in between $108 and $159 million for the remainder of the year. *See id.* at 751.

Cause for concern? Perhaps. But hardly a crisis. Though we do not exclude the possibility that a fiscal calamity could conceivably justify bypassing the notice-and-comment requirement, this case does not provide evidence of such an exigency. The Commission's record is simply too scant to establish a fiscal emergency. It does not reveal when the Fund was expected to run out of money, whether the Fund would have run out of money before a notice-and-comment period could elapse, or whether there were reasonable

alternatives available to the Commission, such as temporarily raising Fund contribution amounts or borrowing in anticipation of future collections. Though no particular catechism is necessary to establish good cause, something more than an unsupported assertion is required. Lacking record support proving the emergency, we hold the Commission erred in promulgating the Interim Order without notice and comment.[4]

III

Sorenson asserts the $75 Rule and the Default-Off Rule violate the ADA and the APA. We need not go beyond the APA challenge. Under the arbitrary-and-capricious standard, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicles Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotation marks omitted). "Normally, an agency rule would be arbitrary or capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

---

[4] The agency also claims a notice-and-comment period would have been contrary to the public interest. *See* Respondents' Br. at 24; *see also Mack Trucks*, 682 F.3d at 94–95. To the extent that the Commission argues a delay in action would have resulted in harm to the public fisc, we remain unconvinced for the same reasons that we find notice and comment practicable.

9

A

The Final Order requires new subscribers to pay at least $75 for their IP CTS-capable phone, unless the phone is provided by a state-run program. This rule is mystifying. The Commission claims the $75 Rule will deter fraudulent acquisition and use of IP CTS equipment. Yet the agency offers no evidence suggesting there is fraud to deter. Nor is there anything in the record demonstrating how a price point of $75 would deter fraud even if it existed.

It is difficult to pinpoint the exact genesis of the $75 Rule. It appears the idea of a price floor was first suggested by one of Sorenson's competitors—Hamilton Relay—in an *ex parte* communication to the Commission. *See* Letter from David A. O'Connor, Counsel for Hamilton Relay, Inc., to Marlene H. Dortch, Esq., Secretary of the Federal Communications Commission, at 1 (Jan. 10, 2013) ("For example, the Commission could adopt a bifurcated eligibility standard, such that any consumer who accepts a free or de minimis cost IP CTS telephone must provide a certification . . . whereas any consumer who legitimately *purchases* an IP CTS telephone for less [sic] than de minimis cost would self-certify, because the user has already demonstrated through his or her purchase that the IP CTS telephone is needed.").[5] Despite the fact that the *ex parte* letter offered no evidence showing the necessity or efficacy of a price floor, the Commission heavily relied on it in promulgating the interim version of the $75 Rule. Indeed, of the seventeen citations concerning the rule in the Interim Order, at least four refer

---

[5] We assume Hamilton Relay meant to recommend self-certification for consumers who purchase IP CTS phones for *more* than de minimis cost.

either to Hamilton Relay's recommendation or an internal analysis thereof. And the Interim Order, in turn, provided the Commission with much of its justification for enacting the final $75 Rule; the Commission cited it repeatedly in issuing the Final Order. The only additional observations produced during the intervening notice-and-comment period came in the form of conjecture, particularly by Sorenson's competitors. *See, e.g.*, J.A. at 287–88 (commenting, on behalf of Sprint, that Sorenson's distribution of free IP CTS-capable phones "placed the provision of IP CTS service on a slippery slope that could lead to the same types of questionable and outright fraudulent activities that have plagued the VRS segment of the market for years"); *see also* Comments of Purple Communications at 6 (Feb. 26, 2013) (speculating that an ineligible user who does not need IP CTS equipment might use it because "the equipment functions like a regular phone" and could be placed "in settings where other non-eligible users may access and use it"). Based on our review of the record, it appears the Commission's rule relies on one unsubstantiated conclusion heaped on top of another.

As Commissioner Pai explained in his dissent to the Interim Order, it is difficult to see how the $75 Rule will help "curtail waste, fraud, and abuse." *See Interim Order*, 28 F.C.C. Rcd. at 751. "[V]irtually anyone who wants IP CTS can get it, even if they do not need it. . . . If a consumer pays at least $75 for IP CTS equipment, he or she does not have to obtain *any* certification . . . to be eligible for free IP CTS service." *Id*. at 751–52. Though we understand the Commission's reasons for abandoning the third-party certification process that formed part of the interim version of the $75 Rule, we are still left with no evidence about the necessity of the price floor.

Put simply, our review of the record leaves us with more questions than answers.  First, where is the evidence that IP CTS technology is being fraudulently used?  Second, where is the proof of the causal relationship between the establishment of a price floor and the deterrence of fraudulent IP CTS use?  Third, how did the Commission arrive at the target price of $75?

The Commission responds that it may rely on its predictive judgment to ignore these questions.  Though "an agency's predictive judgments about the likely economic effects of a rule" are entitled to deference, *see Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 541 (D.C. Cir. 2009), "deference to such . . . judgment[s] must be based on some logic and evidence, not sheer speculation," *Verizon v. FCC*, 740 F.3d 623, 663 (D.C. Cir. 2014) (Silberman, J., concurring in part and dissenting in part).  The Commission may hoist the standard of common sense, of course, but the wisdom of agency action is rarely so self-evident that no other explanation is required.  *See Checkosky v. S.E.C.*, 23 F.3d 452, 463 (D.C. Cir. 1994) (noting that, in *Tex Tin Corp. v. EPA*, 935 F.3d 1321 (D.C. Cir. 1991), we declined to affirm "the agency's decision to place a hazardous waste facility on the National Priorities List" on common sense alone, remanding the case to the EPA "for a better explanation before finally deciding that the agency's action was arbitrary and capricious").  As the Commission failed to "articulate a satisfactory explanation for its action," we deem the promulgation of the $75 Rule arbitrary and capricious.  *See State Farm*, 463 U.S. at 43.

B

We are similarly troubled by the Commission's requirement that IP CTS phones "have a default setting of

captions off, so that all IP CTS users must affirmatively turn on captioning." J.A. at 130. This rule is not only unsupported by the evidence, but contradicted by it.

When the Commission enacted the interim version of the Default-Off Rule, it acknowledged one study showed "those states that require a captions-off default setting for intrastate CTS actually have a slightly higher average number of minutes of use compared with the states that permit the default to be captions on." J.A. at 19. During notice and comment for the final rule, various stakeholders complained about the rule based on their experience with the interim version. Hamilton Relay, for instance, suggested revisiting the necessity of the rule, as "[t]he consumers' loss of . . . efficiency and functionality may [have] outweigh[ed] whatever benefits [were] derived from the restriction." J.A. at 219–20. Ultratec, another IP CTS provider, even presented historical data suggesting there was "no evidence of fraud or misuse of IP CTS" as a result of a captions-on default. J.A. at 311. In fact, it remarked "there is at least some evidence that a 'default off' requirement does not impact . . . captioned telephone usage patterns when [equipment on the customer's premises] is initially distributed with the default on or with the default off." *Id.* Consumers, for their part, also expressed their dismay over the rule, calling it "highly disruptive." J.A. at 95.

And yet, despite the chorus of businesses and consumers opposing continued implementation of the rule, the Commission kept it intact. The disruptiveness, it claimed, would simply go away. *See* J.A. at 97–98 (explaining the Commission "anticipate[d] that most concerns will subside over time as default off becomes familiar"). As for the quantitative data presented by Ultratec and others, the Commission acknowledged a dearth of evidence to prove

fraudulent use.  *See* J.A. at 97 ("[W]e are unable to quantify the amount of IP CTS usage attributable to casual or inadvertent use of captions . . . ."). It instead pointed to evidence suggesting a decline in IP CTS usage after it implemented the interim version of the Default-Off Rule, *see id.*, which, of course, reveals nothing about the decline in *fraudulent* use.

The Commission also cited a research study which showed "50 percent [of surveyed users who share their telephones with persons without hearing loss stated] that those with whom the phone is shared never turn off captions, while another 25 percent said that the sharers only sometimes turn off captions." J.A. at 97 n.311. These numbers, however, must be put into context. What the Commission neglected to mention is that the cited sub-sample was only eight percent (164 individuals) of the surveyed CTS-using population (2,014 users). J.A. at 335, 351. In other words, the vast majority of surveyed users did not share their phones at all, and not all users who shared their phones posed a danger of IP CTS misuse. Moreover, the Commission failed to address the study's ultimate conclusion that "this survey of . . . special captioned telephone users does not support either fraud or misuse as the source of growth in IP CTS." J.A. at 356.

So, like the $75 Rule, the Default-Off Rule was intended to defeat a bogeyman whose existence was never verified, i.e., the fraudulent use of IP CTS technology. But unlike its counterpart, the Default-Off Rule did not want for evidence; instead, there was contrary evidence questioning its efficacy and necessity. The Commission left these serious concerns unaddressed. Accordingly, its decision to implement the Default-Off Rule was arbitrary and capricious. *See El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of*

*Health and Human Servs.*, 396 F.3d 1265, 1278 (D.C. Cir. 2005).

IV

As we resolve both challenges on APA grounds, we need not reach the question of whether the two rules run afoul of Title IV of the Americans with Disabilities Act. *See PDK Labs. Inc. v. U.S. Drug Enforcement Admin.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment) ("[I]f it is not necessary to decide more, it is necessary not to decide more . . . ."). To the extent that Sorenson challenges other rules on various grounds, e.g., the First Amendment, we decline to entertain these arguments.[6] *See Davis v. Pension Benefit Guar. Corp.*, 734 F.3d 1161, 1166–67 (D.C. Cir. 2013) ("[I]t is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

Sorenson asks us to vacate the entire Final Order, but we see no need to do so. Nothing suggests the unchallenged rules, e.g., the labeling requirement and the marketing restrictions, could not "function sensibly without the stricken provision." *See MD/DC/DE Broad. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001). The Final Order therefore need not be invalidated in its entirety.

---

[6] Cutting to the chase, Sorenson would like to be rid of the marketing restrictions of the Final Order. Because the issues surrounding the rules were not properly presented to us, we have no opinion concerning whether the restrictions were properly promulgated in accordance with the ADA, the APA, and the First Amendment.

The petitions for review are granted. We vacate the entire Interim Order, as there was no good cause for bypassing notice and comment. We also vacate the $75 Rule and the Default-Off Rule contained in the Final Order, but we leave the remainder intact. We remand to the Commission for further proceedings.

*So ordered.*