# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 26, 2017        Decided April 6, 2018

No. 15-1038

AT&T, INC.,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

UNITED STATES TELECOM ASSOCIATION AND CENTURYLINK,
INC.,
INTERVENORS

———

Consolidated with 16-1002, 16-1072

———

On Petitions for Review of Orders of
the Federal Communications Commission

———

*Benjamin S. Softness* argued the cause for petitioners. With him on the briefs were *Scott H. Angstreich*, *Robert A. Long Jr.*, *Yaron Dori*, *Kevin King*, *Christopher Heimann*, *Gary L. Phillips*, and *David L. Lawson*.

*Matthew J. Dunne*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on

the brief were *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, U.S. Department of Justice, *Howard J. Symons*, General Counsel, Federal Communications Commission, and *Richard K. Welch*, Deputy Associate General Counsel. *Jacob M. Lewis*, Associate General Counsel, *Maureen K. Flood*, Counsel, and *Sarah E. Citrin*, Attorney, Federal Communications Commission, entered appearances.

Before: GARLAND, *Chief Judge*, and PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court filed by Circuit Judge PILLARD.

PILLARD, *Circuit Judge*: The Federal Communications Commission has, since the agency's inception, been charged to ensure that everyone in the United States has access to critical telecommunications services. This mandate is effected through a system of federal subsidies to certain designated carriers that are required to offer essential services to underserved consumers. Recognizing the changing technological landscape, the Commission is currently in the process of expanding those services that must be universally accessible beyond landline telephone service to include broadband and cellular service. As the transition takes place, the agency has retained some preexisting obligations of a subset of landline-only providers to ensure that underserved populations in a small number of hard-to-reach areas do not lose access to basic telecommunications services during the transition, before the modernized program is fully in effect—July 24, 2018 in most areas. Telecommunications carriers with such legacy obligations bring these petitions challenging the FCC's decision to hold their obligations in place during this interim period.

## I.  Introduction

The telecommunications landscape—and the provision of essential services to hard-to-reach places and underserved individuals—has changed dramatically over the last two decades.  Regional monopolists initially provided telecommunications services, including to remote areas and low-income populations; then, in 1996, Congress introduced competition into telecommunications markets. Telecommunications Act of 1996, Pub L. No. 104-104, 110 Stat. 56 (codified at 47 U.S.C. § 151) (1996 Act); *see Rural Cellular Ass'n v. FCC* (*Rural Cellular I*), 588 F.3d 1095, 1098 (D.C. Cir. 2009).  From 1996 to 2011, the Federal Communications Commission (FCC, Commission, or agency) ensured nationwide landline accessibility through the abovementioned system of service obligations and federal subsidies for certain carriers, called Eligible Telecommunications Carriers (ETCs), that were well-positioned to reach the underserved. *See* 47 U.S.C. § 214(e)(2); *Rural Cellular Ass'n v. FCC* (*Rural Cellular II*), 685 F.3d 1083, 1086 (D.C. Cir. 2012).

In 2011, the FCC recognized that its critical communications mandate was no longer meaningfully fulfilled by ensuring universal access to landlines alone.  To bring the entire United States into the digital age, the Commission redefined these critical services to include broadband and cellular, and began to overhaul its regulatory framework accordingly.  *See In re Connect America Fund*, 26 FCC Rcd. 17,663, 17,667-72 (2011) (*2011 Order*).  It sought to make the provider and subsidy system more technologically advanced and efficient.  *Id.* at 17,668-69.  The Commission also recognized the need to, at a minimum, maintain existing coverage for marginalized populations and hard-to-reach areas while it renovated the federally supported network for

expanded services. The agency opted to retain certain elements of the landline-only ETC regime during the transition insofar as needed to prevent any customers from being cut off from key communications services. It determined that the landline carriers already providing those essential services were in the best position easily and efficiently to prevent coverage gaps.

AT&T and CenturyLink, together with Intervenor industry group U.S. Telecom Association (USTelecom) (collectively Petitioners), are incumbent ETCs that currently retain a small fraction of their pre-2011 landline-only universal service obligations in certain areas—census blocks they once served that are denominated "high-cost" or "extremely high-cost"—until new ETCs can be competitively selected to provide expanded services there. *Id.* at 17,709. For many census blocks, a new ETC will be selected via auction on July 24, 2018. *See* Public Notice, *Connect America Fund Phase II Auction Scheduled for July 24, 2018*, FCC No. 18-6, at 3 (Feb. 1, 2018), https://apps.fcc.gov/edocs_public/attachmatch/FCC-18-6A1.pdf (*2018 Public Notice*). In the interim, the Commission subsidizes the landline-only ETC services at frozen, preexisting funding levels. *2011 Order*, 26 FCC Rcd. at 17,712-13, 17,715.

Most census blocks where these incumbent carriers have ETC obligations have already transitioned to receiving federal subsidies based on the new funding model, which supports capital investment and operating costs for both voice and broadband. *In re Petition of USTelecom for Forbearance*, 31 FCC Rcd. 6157, 6215 & n.365 (2015) (*2015 Order*). The only remaining disputed service obligations are those in the small number of census blocks where an incumbent ETC has been providing landline-only service and has declined, or is otherwise ineligible, to provide expanded services. *See id.*; *2011 Order*, 26 FCC Rcd. at 17,729. Petitioners asked the FCC

either to excuse their universal service obligations in those areas or, in the alternative, to reinterpret the statute to narrow ETC obligations in the same manner. Petitioners here challenge the FCC's partial denials of their requests.

First, in 2014, the FCC granted Petitioners' request in part, relieving them of obligations in certain categories of census blocks where basic service was otherwise assured. *In re Connect America Fund*, 29 FCC Rcd. 15,644, 15,663-64 (2014) (*2014 Order*). At the same time, the Commission left undecided the status of the remaining fraction—about six percent as of the 2015 Order—of high-cost and extremely high-cost census blocks where coverage was not otherwise assured. *Id.*; *2015 Order*, 31 FCC Rcd. at 6215 n.365.

Then, in 2015, the FCC denied Petitioners' request with regard to those remaining census blocks, holding in place the incumbent ETCs' residual service obligations pending completion of the transition. *See 2015 Order*, 31 FCC Rcd. at 6211-12. The agency reasoned that Petitioners had not met their burden to demonstrate that underserved individuals and areas would retain access to essential services in the absence of incumbent ETC landline service. *Id.* at 6216-17. Petitioners failed to marshal sufficiently fine-grained evidence that all vulnerable areas and individuals would continue to have access, and their aggregate data suggested that there would be service shortfalls. *Id.* As a consequence, the FCC decided that available opportunities for Petitioners to seek case-by-case, area-specific forbearance or additional funding to compensate for shortfalls remained the best course. *Id.* at 6224-25, 6229 n. 440. The agency did not want to devote significant resources to overhaul the preexisting system for a short, interim period when it is about to be replaced by the new regime. *See id.* at 6223.

In the same 2015 Order, the Commission finalized the interim landline-only obligations for incumbent ETCs, declining Petitioners' invitation to sunset their obligations by reinterpreting the statute to narrow ETCs' duties. *Id.* at 6226-27. The best reading of the statute, the agency maintained, authorized the interim system of obligations and frozen support. *Id.* at 6228-29.

As a result of the 2014 and 2015 Orders, the only remaining obligations, which Petitioners here dispute, are those not already excused in 2014 and not yet reassigned to a new ETC willing and able to provide modernized universal service. *Id.* at 6215 & n.365. Petitioners challenge the FCC's decision to maintain those service obligations as arbitrary and capricious and contrary to various provisions of the amended Communications Act of 1934, 47 U.S.C. § 151 *et seq.* (Communications Act or Act).

We deny the petitions for two primary reasons. First, we owe deference to the FCC's decision to hold a preexisting regime in place for an interim period, so as to avoid commandeering agency resources and to respect the agency's judgments about how to maintain baseline universal service in the context of uncertainties attending a major regulatory transition. Second, in response to Petitioners' generalized allegations that vulnerable consumers do not need the disputed services and that the existing program leaves Petitioners with underfunded obligations, the FCC has made clear that it will grant case-by-case forbearance or supplemental funding in areas where providers can meet their burden to show that their services are not required or that they need additional financial help. Especially in the context of this systemic regulatory transition, no more is required.

7

## II. Background

A core mission of the FCC, dating from its establishment in 1934 by the Communications Act, is "to make available, so far as possible, to all the people of the United States . . . a rapid, efficient, Nation-wide, and world-wide . . . communication service with adequate facilities at reasonable charges." Pub. L. No. 73-416, 48 Stat. 1064 (codified at 47 U.S.C. § 151). The FCC aims to achieve "universal service" by ensuring that critical communications technologies are made available throughout the United States. *See* 47 U.S.C. § 254. The Act makes clear that the universal service guarantee must be dynamic, so that the public has access to "an evolving level of telecommunications services"; as a result, the Commission must "periodically" redefine the "level of . . . services" that should be universally available to keep pace with technological advancements, need, use, and the public interest. *Id.* § 254(c).

Universal service has remained a consistent and fundamental goal for the FCC, even as the nature of that service and the regulatory means of achieving it have changed. *See Rural Cellular I*, 588 F.3d at 1098. Historically, telecommunications providers formed natural monopolies, and the FCC achieved universal service by authorizing rates to monopoly providers sufficient to enable revenue from easy-to-reach customers, such as city dwellers, to implicitly subsidize service to those in areas that were hard to reach. *In re Federal-State Joint Board on Universal Service*, 12 FCC Rcd. 8776, 8784 (1997) (*First Universal Service Order*); *see Alenco Commc'ns, Inc. v. FCC*, 201 F.3d 608, 616 (5th Cir. 2000). That approach no longer sufficed once the 1996 Act amended the Communications Act to create competition in local telephone markets, eliminating the monopolies. *See Rural Cellular I*, 588 F.3d at 1098; *Alenco Commc'ns*, 201 F.3d at 616.

Beginning in 1996, the FCC therefore imposed obligations on certain well-positioned carriers—ETCs—to maintain landline services for high-cost, hard-to-reach rural areas, as well as indigent households and local institutions like schools, hospitals, and libraries. *See* 47 U.S.C. § 254(h); *First Universal Service Order*, 12 FCC Rcd. at 8790-97. A designated ETC generally served all the needy areas and individuals within a state. *See In re Connect America Fund*, 26 FCC Rcd. 4554, 4669 & n.519 (2011). And Congress established the Universal Service Fund (Fund) to give each ETC financial support in providing those critical services. *See Rural Cellular I*, 588 F.3d at 1098-99.

In 2011, the FCC undertook the above-referenced redefinition of universal service and accompanying program overhaul. Recognizing significant changes to communications technology, the Commission, per its statutory mandate, redefined essential services that should be universally ensured to include broadband and cellular. *See 2011 Order*, 26 FCC Rcd. at 17,667-69. Given providers' differing abilities to offer those expanded services, the agency needed to restructure its ETC system to include carriers capable of providing those newly essential technologies, and doing so most easily and cheaply. *Id.* at 17,669.

During the regulatory transition, to ensure that vulnerable regions and consumers were not completely cut off, the agency opted to hold in place certain preexisting landline-only obligations on incumbent ETCs already established under the pre-2011 system. *Id.* at 17,712-13, 17,715. Just how much support incumbent ETCs are due for providing critical landline services during this transition is the question at the heart of this litigation. In particular, the parties dispute whether the FCC has authority to hold these incumbent ETCs to preexisting obligations at frozen funding levels in a dwindling number of

census blocks pending these blocks' reassignment to broadband universal service providers.

### A. The Communications Act

Two provisions of the Communication Act, as amended by the 1996 Act, are at issue in this case. Section 254 establishes procedures for the FCC, together with the states, to review universal service requirements in light of the changing technological landscape and to propose new regulations governing the provision of universal service. 47 U.S.C. § 254. To guide in the "preservation and advancement of universal service," Section 254 enumerates principles including service quality, reasonable rates, reasonably comparable access nationwide to "advanced telecommunications and information services," "specific, predicable and sufficient" financial support for universal service providers, and generally equitable contributions to universal service by all telecommunications providers. *Id.* § 254(b); *see also id.* § 254(e) (requiring "explicit and sufficient" funding for universal service providers). That section also grants the Commission authority to identify, with state input, "other principles . . . necessary and appropriate for the protection of the public interest, convenience, and necessity." *Id.* § 254(b)(7). The FCC used that authority in 1997 to establish an additional principle of "competitive neutrality" among providers and technologies, requiring that specific universal support mechanisms "neither unfairly advantage nor disadvantage one provider over another." *First Universal Service Order*, 12 FCC Rcd. at 8801.

Section 214(e)(1), also enacted in 1996, spells out the competitive regime carriers' eligibility and obligations with regard to effecting nationwide universal service coverage. Only a carrier "designated as an eligible telecommunications carrier" may receive universal-service support from the

Universal Service Fund. 47 U.S.C. § 214(e)(1). Any carrier that the FCC designates as eligible for support must, "throughout the service area for which the designation is received, . . . offer the services that are supported by Federal universal service support mechanisms." *Id.*

As amended in 1996, the Act also defines ETCs' service areas. The Act provides that an ETC's "service area" is the "area established . . . for the purpose of determining universal service obligations and support mechanisms." *Id.* § 214(e)(5).

B. The Transition to Modernized Universal Service

When the FCC in 2011 recognized that the communications landscape had fundamentally changed and sought to overhaul its universal service scheme to include nationwide broadband coverage, it called on ETCs going forward to "offer broadband service in their supported area." *2011 Order*, 26 FCC Rcd. at 17,667-68, 17,695. The FCC also began to revise the support mechanisms for ETCs providing those services. *See id.* at 17,673. Between 1996 and 2011, state boundaries defined the relevant "service areas" by default, so federal support for ETCs was calculated based on the cost of providing necessary services across the state. *See id.* at 17,714. Under the new system, in contrast, ETCs would be designated on a census-block basis, and would receive federal subsidies based on a new cost-projection model; in some cases, the old landline-only ETCs signed up to continue to serve areas, but in others a new ETC would have to be selected via a competitive auction—for many census blocks in July 2018— to determine the most effective and efficient provider. *Id.* at 17,725, 17,727-29, 17,732-33; *2018 Public Notice* at 3.

In order to facilitate the rollout of universal broadband access without compromising existing universal landline service in high-need areas and to high-need individuals, the

FCC planned to stagger the phasing in of new requirements and the phasing out of old ones. *See 2011 Order*, 26 FCC Rcd. at 17,727. The Commission decided that incumbent ETCs would retain preexisting obligations, at preexisting funding levels, until the FCC identified the replacement ETC provider that would bring a modernized universal service package to a specific area. *See id.* Incumbent ETCs were in the best position to provide the basic landline service during the transition; after all, they were already doing it. *See 2015 Order*, 31 FCC Rcd. at 6232.

To explore ways that it might nevertheless minimize those interim obligations, the FCC included in its 2011 Order describing the ETC modernization a call for comment on whether there could or should be a "relaxation of . . . [ETC] voice service obligations" of incumbent providers pending completion of the transition. *2011 Order*, 26 FCC Rcd. at 18,063-64. The FCC wanted to identify areas where it might, without creating service gaps, excuse certain incumbent ETC landline obligations even before the regulatory transition was complete. *Id.* at 18,064-65. (As noted above, the agency ultimately excused many such obligations, leaving landline-only ETCs with continued commitments in only a small fraction of the census blocks they once served.)

In many states, incumbent ETCs—including Petitioners here—opted to renew their obligations, taking on new broadband requirements and concomitant funding awards newly calculated to support the modernized service. *See* Joint App'x (J.A.) 2129-30 (CenturyLink); *id.* at 2131 (AT&T). In those states, no incumbent ETC continues to bear any separate universal service obligation to maintain landline service. But in other states, the FCC has yet to select ETCs to provide modernized universal service. Hard-to-reach areas within

those states are where Petitioners retain the landline service obligations to which they object.

C. The Challenged Orders

Petitioners asked the Commission to be excused from their continued landline-only ETC obligations and funding by filing a request for blanket forbearance. *See 2014 Order*, 29 FCC Rcd. at 15,663. They also submitted comments urging the FCC to reinterpret parts of the Act to strictly limit ETC obligations so as to sunset those preexisting duties. *Id.* Petitioners here challenge the FCC's orders that only partially granted their forbearance request and kept their service obligations in certain census blocks where new ETCs have yet to be engaged. In those blocks, the FCC obligates incumbent ETCs to provide basic landline services pending upcoming auctions to select providers of modernized universal service.

In the 2014 Order, the first of the two under review, the FCC granted USTelecom's forbearance petition in part, halting enforcement of incumbent ETC obligations for three categories of census blocks: (1) low-cost blocks; (2) blocks served by an unsubsidized competitor that meets certain voice and broadband minima; and (3) blocks served by another ETC offering voice and broadband. *See id.* at 15,663. The Commission reasoned that the services required under the modernized universal service obligation were already readily available in those categories of census blocks, so there was no reason to continue to subject incumbent ETCs to preexisting landline obligations there. *Id.* at 15,665.

As a consequence of the partial grant of forbearance, Petitioners have residual service obligations in only two categories of census blocks: high-cost and extremely high-cost census blocks where the incumbent ETC declined to (or could not) become the ETC for purposes of the modernization. *See*

*id.* at 15,664-65; *2015 Order*, 31 FCC Rcd. at 6211-12. In all of those census blocks, the FCC plans to select new ETCs but has yet to do so. *See 2014 Order*, 29 FCC Rcd. at 15,664-65. But the FCC deferred a final determination regarding continued landline-only ETC obligations for incumbents in those areas and asked for further comment. *Id.* at 15,664-65, 15,702.

AT&T then petitioned this court for review of the 2014 Order on the ground that the Commission had "adopted a rule" regarding the incumbent ETCs' obligations in the residual areas. *See* Pet'rs' Br., *AT&T, Inc. v. FCC*, No. 15-1038, Dkt. No. 15-57573 at 3 (June 15, 2015). The FCC moved for abeyance of that petition because the 2014 Order had adopted no such rule; indeed, it had not yet decided those issues and still had them under consideration. *See* FCC Motion to Hold Case in Abeyance, *AT&T, Inc. v. FCC*, No. 15-1038, Dkt. No. 1560813 (July 2, 2015). In September 2015, this court granted the requested abeyance. *See AT&T Inc. v. FCC*, No. 15-1038, Dkt. No. 1571313 (D.C. Cir. Sept. 3, 2015) (per curiam order).

In the wake of the FCC's 2014 Order and our abeyance order, Petitioners submitted further comments to the Commission arguing that incumbent ETCs' landline-only universal service obligations in remaining high-cost and extremely high-cost census blocks should be excused. *See, e.g.*, J.A. 2132-38 (comments of AT&T). Particularly, they pointed to a subset of census blocks for which, based on the old formula, they did not receive much—or, in a rare case, perhaps any—high-cost support. *See, e.g.*, J.A. 2136-37.

In December 2015, the FCC issued another order, the second of the two now under review. That 2015 Order ruled on the remainder of USTelecom's forbearance petition, denying the request for forbearance from incumbent ETCs' interim obligations in otherwise underserved high-cost and

extremely high-cost census blocks. *2015 Order*, 31 FCC Rcd. at 6211-12. Recognizing, however, that there might be areas in which even maintaining existing landline service could be a hardship for incumbent ETCs, the FCC reiterated that it would entertain case-by-case forbearance petitions or applications for additional funding where providers could show a particularized need. *Id.* at 6224, 6229 n.440.

In finalizing incumbent ETCs' interim landline obligations, the FCC also declined to "reinterpret section 214(e)(1) to require that [incumbent] carriers only provide voice services in areas where they are *receiving* support." *Id.* at 6227. Instead, the FCC cited prior orders interpreting the Act not to "require that all ETCs must receive support, but rather only that carriers meeting certain requirements be *eligible* for support." *Id.* (quoting *In re High-Cost Universal Service Support*, 23 FCC Rcd. 8834, 8847 (2008)); *see id.* at 6227 n.431. The agency discussed how "incumbent . . . carriers' long history of providing service in the relevant service areas, coupled with the fact that they have already obtained the ETC designation necessary to receive universal service support to serve those areas, puts them in a unique position to maintain voice service as we transition fully" to the new system. *Id.* at 6232.

## III. Discussion

Petitioners challenge the 2014 and 2015 Orders as contrary to the Commission's statutory authority. *See* 5 U.S.C. § 706(2)(C). If, as the FCC contends, the statutory provisions are "silent or ambiguous with respect to the specific issue," this court defers to an agency's interpretation that is "based on a permissible construction of the statute." *Chevron U.S.A., Inc. v. Nat. Res. Def. Council*, 467 U.S. 837, 843 (1984). But "[i]f the intent of Congress is clear," as Petitioners contend, the

reviewing court must "give effect to that unambiguously expressed intent." *Id.* at 842-43.

Petitioners also challenge the FCC's orders as "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). While our review of such a claim is "highly deferential," *Nat'l Tel. Coop. Ass'n v. FCC*, 563 F.3d 536, 541 (D.C. Cir. 2009), we require that the FCC at least "must examine" the relevant factors and data and articulate a "rational connection" between the record and the agency's decision, *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (second quotation from *Burlington Truck Lines v. United States,* 371 U.S. 156, 168 (1962)).

We owe particular deference to interim regulatory programs involving some exigency, like the one at issue here. *Rural Cellular I*, 588 F.3d at 1105-06; *MCI Telecomms. Corp. v. FCC*, 750 F.2d 135, 141 (D.C. Cir. 1984). That added deference reflects the reality that, during a transition period, an agency must make "predictive judgments" and "certainty is impossible." *Rural Cellular I*, 588 F.3d at 1105; *see Melcher v. FCC*, 134 F.3d 1143, 1151-52 (D.C. Cir. 1998). To that end, this court has been reluctant to interfere with an agency decision to freeze aspects of a preexisting regime for an interim period until a new program can be fully phased in—including in the context of the FCC's comprehensive, high-cost universal service reform. *Rural Cellular I*, 588 F.3d at 1099-1100, 1105 (upholding an interim cap on existing subsidy payments to certain ETCs). Such interim measures must be accorded "[s]ubstantial deference" to permit the agency "to maintain the status quo so that the objectives of a pending rulemaking proceeding will not be frustrated." *MCI Telecomms.*, 750 F.2d at 141; *see Rural Cellular I*, 588 F.3d at 1105-06. That substantial judicial deference also respects the agency's

prerogative to dedicate its resources to "its top priority" of "ensuring that all regions of the nation have access to advanced telecommunications technology" without also "expending significant time and resources . . . updat[ing] the current cost model" that will soon be replaced. *Vt. Pub. Serv. Bd. v. FCC*, 661 F.3d 54, 64-65 (D.C. Cir. 2011) (internal quotation marks omitted).

The FCC's interpretations of "its own orders and regulations" are also owed deference because of the agency's superior knowledge of its own regulations. *Cellco P'ship v. FCC*, 700 F.3d 534, 544 (D.C. Cir 2012) (quoting *MCI Worldcom Network Servs., Inc. v. FCC*, 274 F.3d 542, 548 (D.C. Cir. 2001)); *see Auer v. Robbins*, 519 U.S. 452, 461 (1997).

We first address Petitioners' threshold argument that the court should not consider the 2015 Order at all, on the ground that it impermissibly supplies *ex post* justifications for *de facto* rules adopted by the 2014 Order. Second, we evaluate the FCC's statutory authority to act as it did. Finally, we turn to Petitioners' argument that the challenged Orders are arbitrary and capricious.

A.  The Procedural Permissibility of the 2015 Order

Petitioners contend that the 2015 Order impermissibly supplies *ex post* rationales for the 2014 Order, review of which should be confined to the reasons stated therein. A practical consequence of the 2014 Order's partial grant of blanket forbearance was to leave in place some incumbent ETCs' landline-only obligations in a fraction of high-cost and extremely high-cost census blocks. Petitioners contend that the 2014 Order thus established a *de facto non*-forbearance rule with respect to those remaining, unaddressed census blocks. As a result, they believe that we should look only to the reasons

supplied in the 2014 Order and disregard the 2015 Order's reasons for retaining service obligations in those census blocks.

The FCC says its 2014 Order did not purport to pass on the elements of the petition that the agency ultimately denied in the 2015 Order. We are mindful that the agency's reading "must be given controlling weight unless it is plainly erroneous or inconsistent." *Stinson v. United States*, 508 U.S. 36, 45 (1993) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)).

The 2014 Order is limited to granting the forbearance petition "in part" and only "to the extent described"; it nowhere denied any part of the petition. *See 2014 Order*, 29 FCC Rcd. at 15,702 ¶ 167. The text of the 2014 Order acknowledged that the "result of [its] limited forbearance" was that incumbent carriers retained existing obligations in the remaining census blocks. *Id.* at 15,664 & n.117. At the same time, the possibility of additional "forbearance or other relief . . . where forbearance was not granted" by the 2014 Order "remain[ed] under active consideration before the agency." Public Notice, *Wireline Competition Bureau Releases List of Census Blocks Where Price Cap Carriers Still Have Federal High-Cost Voice Obligations*, 30 FCC Rcd. 7417, 7419 ¶ 5 & n.12 (2015); FCC Motion for Leave to Seek to Hold Case in Abeyance, *AT&T, Inc. v. FCC*, No. 15-1038, Dkt. No. 1560810 at 2 (July 2, 2015); *see In re Lifeline and Link Up Reform and Modernization*, 30 FCC Rcd. 7818, 7864 & n.261 (2015).

The FCC's position that the 2014 Order was not its last word on the forbearance petitions is buttressed by the agency's statutory time window to respond to USTelecom's forbearance petition, which remained open when the Commission issued its 2014 Order. *See AT&T Inc. v. FCC*, No. 15-1038, Dkt. No. 1571313 at 2 (D.C. Cir. Sept. 3, 2015) (per curiam order).

Under Section 10(c) of the Act, the agency has up to one year plus ninety days to respond to a petition for forbearance. 47 U.S.C. § 160(c). The timing of the 2014 Order, only a few months after the petition's filing, supports the agency's characterization of its actions: The agency dealt with part of the petition when it still had ample time—until January 4, 2016—to deal with the rest of it, all of which it would handle before the deadline. *See* FCC Motion to Hold Case in Abeyance, *AT&T, Inc. v. FCC*, No. 15-1038, Dkt. No. 1560813 at 2 (July 2, 2015).

The FCC's view of its own, multi-stage action is the natural way to understand the Commission's actions. As a consequence, we consider the 2014 and 2015 Orders.

B. The Statutory Permissibility of the Interim Regulatory Regime

Petitioners challenge the interim regime as contrary to various provisions of the Communications Act that they argue compel certain sums of federal funding not offered during this transition period.

1. Section 214(e)(1): "ETCs shall offer the services that are supported"

Petitioners urge that the FCC's interim regime violates Section 214(e)(1). That section provides that an ETC "shall be eligible to receive universal service support in accordance with section 254 . . . and shall, throughout the service area for which the designation is received . . . offer the services that are supported by Federal universal service support mechanisms under section 254(c)." 47 U.S.C. § 214(e). The interim regime runs afoul of that requirement, say Petitioners, by leaving in place service obligations that are not financially "supported" within the meaning of the statute.

Petitioners assert that the only permissible way to read "the services" that are "supported" is as requiring the FCC to dole out a satisfactory sum for each essential service that an ETC provides in a specific location. Under that reading, incumbent ETCs are not adequately funded under the interim scheme because funding levels are not determined by the cost to providers of supplying a particular high-cost service.

The Commission, in contrast, reads "services that are supported" to refer more generally to "the *types* of services that ETCs must provide . . . rather than to *instances* of service for which a carrier receives support." Resp't Br. 38. That is, the agency interprets the provision "to refer broadly to the services that the Commission establishes as universal service, rather than only referring to services insofar as an ETC actually receives universal service support for its provision of them." *2015 Order*, 31 FCC Rcd. at 6228. The FCC describes the relevant "type of service" as "voice telephony," and takes it to include all universal service programs—whether high-cost landline support, or other programs that service schools, hospitals, and libraries, or indigent individuals. *See* Resp't Br. 38; *2015 Order*, 31 FCC Rcd. at 6227-29. The FCC thus contends that incumbent ETCs must continue to provide "the services that are supported" under the interim regime because those ETCs are providing essential voice services and receive funding for those services generally, even if a particular high-cost service is not guaranteed to be a breakeven proposition for providers in each and every census block. *2015 Order*, 31 FCC Rcd. at 6228-29.

The FCC's reading does not conflict with Section 214(e)(1)'s general command that ETCs offer "services that are supported." In fact, it is supported by the statute's text. A cross-reference in Section 214(e)(1) tethers its definition of "the services that are supported" as it appears in Section

214(e)(1) to Section 254(c), which uses the same phrase to identify, as a general matter, the types of services required to be universally provided (as determined by the Commission)— those that have, like voice telephony, for example, "been subscribed to by a substantial majority of residential customers." *See* 47 U.S.C. § 254(c)(1). The legislative history provides further support for the FCC's reading by glossing ETC obligations to include all of "the services included in the definition of universal service," S. Rep. No. 104-230, at 141 (1996) (Conf. Rep.), while making clear that, from a funding perspective under Section 214(e)(1), an ETC need only "be *eligible* to receive support payments, *if any*, established by the Commission or a State to preserve and advance universal service," *id.* at 129 (emphases added). The text and history of Section 214(e) thus suggest that "the services that are supported" can, consistent with the FCC's reading, refer to the whole package of voice services and broadly require eligibility, not services as priced and paid for à la carte for each distinct area.

Considering the 2011 Order setting out the FCC's planned overhaul of its universal service program, the Tenth Circuit has held that that this same phrase is, at a minimum, open to the FCC's interpretation. *See In re FCC 11-161*, 753 F.3d 1015, 1088 (10th Cir. 2014); *see also Tex. Office of Pub. Util. Counsel v. FCC*, 183 F.3d 393, 412 (5th Cir. 1999) (approving the agency's reading of the statute, requiring that ETCs be "eligible" for funding, not that they receive "support . . . equal [to] the actual costs incurred"). We, too, find the FCC's interpretation to be reasonable.

The interim measure, then, satisfies Section 214(e)(1) because incumbent ETCs receive and remain eligible for federal funding. Incumbent ETCs continue to receive considerable high-cost support, both in the form of frozen

funding for interim landline ETC service and subsidies calculated by the new model for broadband-inclusive service. *2015 Order*, 31 FCC Rcd. at 6229.  In addition, incumbent ETCs can receive various forms of supplemental funding from the FCC or states based on a particularized showing of need arising from the provision of high-cost landline service during the regulatory transformation.  *See id.* at 6229 & n.440, 6231-32; *In re FCC 11-161*, 753 F.3d at 1088.  Therefore, under the Commission's reasonable reading, Petitioners are eligible for funding, as Section 214(e) requires.

### 2.  Section 214(e)(5):  "service areas"

Petitioners also challenge the interim scheme as contrary to the Act's definition of "service area."  Under the Act, a "service area" is "a geographic area established . . . for the purpose of determining universal service obligations and support mechanisms."  47 U.S.C. § 214(e)(5).  Petitioners argue that, "[b]ecause [old] statewide service areas no longer serve 'the purpose of determining . . . support mechanisms,'" the FCC cannot maintain incumbent ETC service obligations on a statewide basis.  Pet'rs' Reply Br. 10 (quoting 47 U.S.C. § 214(e)(5)) (ellipsis in original).

But the old "service areas" remain the touchstone for incumbent ETCs' frozen funding for interim landline-only service.  The FCC calculates the frozen sum with reference to statewide service areas because funding remains a product of the old formula, based on service across the state.  Other ETC funding, too, is available on a statewide basis, such as targeted service for low-income individuals.  *2015 Order*, 31 FCC Rcd. at 6214, 6225.  As a result, statewide service areas remain a reference point for "determining . . . support mechanisms" and obligations, in keeping with the statute.

C. The Interim Regime's Reasonableness & The FCC's Reasons

Petitioners further argue that, in retaining preexisting obligations, the FCC failed to adequately balance the several universal service principles set forth in Section 254(b). Those principles are: (1) quality and "affordab[ility]" of services; (2) nationwide access to "advanced telecommunications"; (3) nationwide access at "reasonably comparable" rates in high-cost areas; (4) "equitable and nondiscriminatory contribution[s]" by carriers; (5) "sufficient" funding for carriers; (6) access for public services like "schools . . . , health care providers, and libraries"; and (7) "other principles," which the FCC has specified to include "competitive neutrality." 47 U.S.C. § 254(b); *First Universal Service Order*, 12 FCC Rcd. at 8801. Petitioners frame the FCC's failure as, first, an unexplained vindication and impermissible prioritization of "universal access," second, neglect of the principle of "competitive neutrality," and, third, misreading and so failing to fulfill the requirement of "sufficient" funding. We address each argument in turn.

1. Universal Access

Petitioners criticize the FCC's chosen means of preserving "universal access" under Section 254(b) in two respects. Petitioners contend that the FCC did not explain how continuing their obligations helped to fulfill the Act's universal-access objective. And they assert that the FCC designed its scheme in violation of Section 254(b) because it pursued universal access at the expense of the other factors Section 254(b) lists.

Petitioners contend that retaining ETC designations and obligations is unnecessary to protect service to consumers. But the agency found that, for now, some consumers need residual

universal landline service. *See 2015 Order*, 31 FCC Rcd. at 6221-23, 6231. Before deciding to keep in place some of the incumbent ETCs' obligations, the Commission analyzed Petitioners' blanket forbearance proposal with reference to "the consumer protection goals identified in" the statute. *Id.* at 6216. The FCC was particularly concerned whether, if ETC interim obligations were dropped, "consumer[s] living in high-cost or extremely high cost census blocks . . . will continue to have access to voice service at reasonably comparable rates." *Id.* at 6217. "[N]o other proposals" for interim regulation, the FCC concluded, "would provide assurance that [those] consumers will continue to have access to voice service at reasonably comparable rates" during the transition. *Id.* at 6233. And data that Petitioners submitted to the agency suggested that nearly "one-quarter of U.S. households rely on traditional switched service," *id.* at 6162, such that in the absence of interim landline ETC obligations, a significant number of otherwise underserved individuals might lose telecommunications service altogether. The agency determined, then, that retaining incumbent ETCs' residual obligations in high-cost census blocks would "serve the public interest and advance universal service." *Id.* at 6231.

The agency also invoked the admittedly imprecise predictive task of projecting how best to "protect consumers" and ensure "just and reasonable" market rates during the uncertainty of a complex regulatory transition. *Id.* at 6218, 6221-22. This court has "repeatedly held" that difficulties of predicting the results of a regulatory shift are a "standard and accepted" justification for such a "temporary rule." *Rural Cellular I*, 588 F.3d at 1105-06 (citing *Competitive Telcomms. Ass'n v. FCC*, 309 F.3d 8, 14 (D.C. Cir. 2002)). The FCC was not confident that it could "reasonably predict that customers will continue to be served with voice service at reasonably comparable rates if the [incumbent ETC] carrier no longer has

this obligation." *2015 Order*, 31 FCC Rcd. 6221. As such, the agency's decision to hold those obligations in place temporarily is reasonable and adequately reasoned.

Petitioners further assert that, even if the FCC found a demonstrated need to retain the obligations, the way the Commission designed its interim regime fails to account for Section 254(b) factors other than universal access. The FCC did, however, address the other factors. For example, as discussed below, it addressed both "competitive neutrality" and "sufficient" funding before it determined "on balance" how to advance the statute's aims. *Id.* at 6231-33. The record therefore does not support Petitioners' claim that the FCC's consideration began and ended with the universal-service objective.

### 2. Competitive Neutrality

Petitioners further argue that the 2015 Order ignores and therefore violates the principle of "competitive neutrality" in its differential treatment of the responsibilities and funding of incumbent ETCs and newcomers. Petitioners give too little credit to the FCC's reasoning and balancing.

"Competitive neutrality" stands for the idea that "universal support mechanisms and rules neither unfairly advantage nor disadvantage one provider over another, and neither unfairly favor nor disfavor one technology over another." *See First Universal Service Order*, 12 FCC Rcd. at 8801. We have held that competitive neutrality "only prohibits the Commission from treating competitors differently in 'unfair' ways," and not from according different treatment to competitors whose circumstances are materially distinct. *Rural Cellular I*, 588 F.3d at 1104. Of particular relevance here, "competitive neutrality" does not require the "same levels of support to all ETCs." *Id.* at 1105. In *Rural Cellular I*, we rejected a

challenge to a cap on federal funding for only one category of ETCs, recognizing that "targeting only [one type of ETC] was hardly unfair" in view of the agency's findings that those ETCs had disproportionately drawn on federal resources. *Id.* at 1104.

The 2014 and 2015 Orders holding constant certain service obligations and funding mechanisms similarly rest on the FCC's findings that incumbent ETCs remained in the best position, given existing practice and infrastructure, to maintain existing services, at existing funding levels. *See 2015 Order*, 31 FCC Rcd. at 6232-34. In concluding that these carriers are in "a unique position to maintain voice service as we transition fully," the agency relied on their "long history of providing service in the relevant service areas, coupled with the fact that they have already obtained the ETC designation necessary to receive universal service support to serve those areas." *Id.* at 6232. The FCC thus took account of how "new ETCs are differently situated than incumbent ETCs," *id.* at 6234, particularly with respect to incumbent ETCs' "history" and their ability to continue to "serv[e] customers with voice services." *Id.* at 6233. The agency then reasonably concluded that, for a small subset of census blocks during a limited, transitional period, "the benefits of maintaining voice service" in terms of consumer access "outweigh . . . concerns" about competitive neutrality. *Id.* at 6232.

The Commission also offered additional funding for incumbent ETCs as needed. In *Rural Cellular I*, we noted the availability of such additional funding as a mechanism to ameliorate on a case-by-case basis any potentially "unfair" effects. *Rural Cellular I*, 588 F.3d at 1105 ("[T]o the extent a [carrier affected by the cap] believes it should be entitled to greater per-line high-cost support than the amount disbursed under the cap, the *Order* permits [it] to obtain an exception upon 'fil[ing] cost data.'") (alteration in original). Here, the

FCC has provided for additional funding on a case-by-case basis for any ETCs that find they require more support. *2015 Order* at 6229 n.440. That safety valve provides additional assurance that the scheme will not, in practice, be "unfair" to incumbents. The FCC thus identified adequate grounds for distinguishing between incumbent ETCs and new ones and, by providing for additional funding, ensured that incumbents would not be left with an "unfair" burden in any service area.

In advancing its policy priorities to serve the public interest, convenience, and necessity, the FCC may, so long as it explains itself, determine how to account for the various guiding principles in Section 254(b). *See Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 971 (D.C. Cir. 1999). The FCC here met its obligation to consider competitive neutrality as one among several principles.

### 3. "Sufficient" Funding

Finally, Petitioners assert that the FCC failed to ensure "sufficient" funding for incumbent ETCs, or at least that its reasoning on this point was inadequate.

We start from the premise that the FCC is entitled to deference about what constitutes "sufficient" funding. Under Section 254(b)(5), the Commission is responsible for developing "specific, predictable and sufficient . . . mechanisms to preserve and advance universal service." 47 U.S.C. § 254(b)(5). This obligation overlaps with Section 254(e)'s requirement that the Commission establish "explicit and sufficient" funding for ETCs. *Id.* § 254(e). "Since the principles outlined use 'vague, general language,' courts have analyzed language in § 254(b) under *Chevron* step two." *Rural Cellular I*, 588 F.3d at 1101-02 (citing *Chevron*, 467 U.S. at 843); *see also In re FCC 11-161*, 753 F.3d at 1055; *Tex. Office of Pub. Util. Counsel*, 183 F.3d at 425-26. So, too, for Section

254(e). *See Tex. Office of Pub. Util. Counsel*, 183 F.3d at 425-26. Our role is to consider whether the agency's interpretation is "a permissible construction" and to uphold it so long as it is reasonable, even in the face of "'other reasonable, or even more reasonable, views.'" *Rural Cellular I*, 588 F.3d at 1102 (quoting *AT&T Corp. v. FCC*, 220 F.3d 607, 621 (D.C. Cir. 2000)).

Examined with appropriate deference, the FCC's interpretation defeats Petitioners' claim that the statute mandates federal funding at a level that would ensure an attractive business case for providers in each and every census block. To the contrary, Section 254 does not compel any particular level of funding to count as "sufficient" under the Act. *Rural Cellular I*, 588 F.3d at 1103.

In fact, we have held—contrary to Petitioners' position—that "sufficient" funding under Section 254(b)(5) is not merely a means to sweeten the pot for providers. Rather, it "seeks to strike an appropriate balance between the interests of" consumers and industry. *Id.* at 1102. Too-ample funding or compensation of carriers may even "itself violate the sufficiency requirements of the Act" by so "detracting from universal service by causing rates unnecessarily to rise, thereby pricing some consumers out of the market." *Id.* at 1103 (quoting *Alenco,* 201 F.3d at 620 (alteration omitted)); *see Qwest Commc'ns Int'l Inc. v. FCC,* 398 F.3d 1222, 1234 (10th Cir. 2005).

The FCC's mandate to balance carrier compensation and consumer access is reflected in the statutory structure of the "sufficient" funding requirement under Section 254(b)(5): The sufficiency of funding is but one of several enumerated principles that the FCC must consider in devising universal service mechanisms. *See* 47 U.S.C. § 254(b). It makes good

sense that the FCC has considered funding's sufficiency "in light of the other statutory directives." *In re FCC 11-161*, 753 F.3d at 1060. And here the Commission has, in keeping with our guidance in *Rural Cellular I*, 588 F.3d at 1103, set "sufficient funding" levels that also take account of consumer access and affordability. *2015 Order*, 31 FCC Rcd. at 6217, 6233. As a consequence, the FCC's conclusion that funding may fall short of full compensation in particular areas and still be "sufficient" is faithful to Section 254(b)(5) of the Act.

Petitioners do not identify any salient difference between "specific" and "sufficient" funding for the purposes of Section 254(b)(5) and Section 254(e)'s parallel mandate that ETC funding be "explicit and sufficient." As a consequence, we conclude that the existing subsidies also satisfy Section 254(e) of the Act.

Petitioners further contend that, even accepting the FCC's interpretation of funding "sufficiency" under Section 254, the Commission failed to justify the particular funding levels held in place here. However, it weighs substantially in our thinking that the agency is not writing "on a blank slate, but rather against the backdrop of a decades-old regulatory system." *2011 Order*, 26 FCC Rcd. at 17,727. The FCC is keeping this existing program in place during a temporary period of regulatory transition. *See Rural Cellular I*, 588 F.3d at 1105; *Melcher*, 134 F.3d at 1151-52; *MCI Telecomms.*, 750 F.2d at 141. The agency's obligation to reiterate the basis of the scheme being phased out is therefore somewhat relaxed, especially in light of the agency's prerogative not to "expend[] significant time and resources"—so as to potentially "impede" its ability to fulfill its statutory directives—on a program that will soon be replaced. *Vt. Pub. Serv. Bd.*, 661 F.3d at 64-65; *see MCI Telecomms.*, 750 F.2d at 141. The Commission provided in the 2015 Order for continued "eligib[ility] to

receive high-cost support" that it believed would suffice. *See 2015 Order*, 31 FCC Rcd. at 6233. It also noted that incumbent "carriers have not provided enough information beyond generalized assertions . . . that the support they receive . . . is insufficient." *Id.*; *see also id.* at 6222-23. Under the agency's modest obligation to re-justify its existing subsidy program, its rationale suffices.

If Petitioners' mandate in some census blocks proves, at the end of the day, to be unnecessary, or underfunded and therefore untenable, the FCC has expressly taken the potential for such hardships into account. As discussed above, the interim regime keeps in place mechanisms for relief that together can ensure "sufficient" funding, including "case-by-case" forbearance by the FCC (or the state), *2015 Order*, 31 FCC Rcd. at 6224; *see also 2011 Order*, 26 FCC Rcd. at 18,064-65, and case-by-case additional funding from the FCC (or the state), *2015 Order*, 31 FCC Rcd. at 6229 n. 440. We therefore affirm the agency's reasoned conclusion that its general but limited forbearance, plus the continued availability of continued case-by-case supplemental funding or forbearance answered industry concerns.

## IV. Conclusion

The FCC is shepherding the nation's communications infrastructure into the Twenty-First Century, even as it seeks to ensure that hard-to-serve areas and individuals retain access at least to basic landline service. The Commission is owed deference as it temporarily holds in place preexisting requirements until the new systems are up and running. And the FCC has provided for sufficient case-by-case relief if and when Petitioners establish a need for it. There is no defect in the FCC's challenged Orders. We therefore deny the petitions.

*So ordered.*