# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued October 15, 2020          Decided June 4, 2021

No. 20-1003

TRI-COUNTY TELEPHONE ASSOCIATION, INC.,
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND UNITED
STATES OF AMERICA,
RESPONDENTS

———

On Petition for Review of Orders of the
Federal Communications Commission

———

*Keenan P. Adamchak* argued the cause for petitioner. With him on the briefs was *Donald J. Evans*.

*Sarah E. Citrin*, Counsel, Federal Communications Commission, argued the cause for respondents. With her on the brief were *Michael F. Murray*, Deputy Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Adam D. Chandler*, Attorneys, *Thomas M. Johnson Jr.*, General Counsel, Federal Communications Commission, *Ashley S. Boizelle*, Deputy General Counsel, and *Richard K. Welch*, Deputy Associate General Counsel. *Matthew C. Mandelberg*, Attorney, U.S. Department of Justice, and *Jacob M. Lewis*, Associate General Counsel, Federal

Communications Commission, entered appearances.

Before: TATEL and GARLAND*, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed PER CURIAM.

PER CURIAM: Hurricanes Irma and Maria devastated Puerto Rico and the U.S. Virgin Islands ("the Territories") in September 2017. Amidst other damage, the storms destroyed large portions of the Territories' telecommunications networks. In response to the emergency, the Federal Communications Commission issued three orders that provided subsidies to help rebuild those networks.

Petitioner Tri-County Telephone Association ("Tri-County") challenges two of those orders under the Administrative Procedure Act (APA) and the Communications Act. Tri-County argues that in one order, the Commission bypassed notice and comment without good cause and failed to justify its chosen amount and allocation of funds. And it argues that in both orders, the Commission departed from a previous policy without explanation and contravened several provisions of the Communications Act. We reject all of Tri-County's challenges and deny the petition for review.

## I.

Section 254 of the Communications Act directs the Commission to make policies "for the preservation and advancement of universal service." 47 U.S.C. § 254(b). It sets out six principles to guide those policies, including, as relevant

---

* Then-Judge Garland was a member of the panel at the time this case was argued but did not participate in the final disposition of the case.

here, that consumers in "rural, insular, and high cost areas" should have access to services and rates that are "reasonably comparable" to those provided in urban areas, *id.* § 254(b)(3), and that "[t]here should be specific, predictable and sufficient . . . mechanisms to preserve and advance universal service," *id.* § 254(b)(5). Pursuant to these directives, the Commission maintains a Universal Service Fund from which it disburses subsidies to telecommunications carriers in areas that are rural, insular, or otherwise costly to serve. *See* 47 C.F.R. §§ 54.1– 54.1612. It finances the Fund with contributions assessed on interstate carriers, *see* 47 U.S.C. § 254(e); 47 C.F.R. § 54.706, and refers to subsidies set aside for high-cost areas as "high-cost funds" or "high-cost support." Telecommunications carriers in the Territories have historically received these high-cost funds.

When Hurricanes Irma and Maria devastated the Territories' telecommunications networks in September 2017, the Commission allocated additional resources from the Fund to help rebuild. Hurricanes Irma and Maria were two of the worst hurricanes on record to impact the Territories. *See The Uniendo a Puerto Rico Fund and the Connect USVI Fund*, 34 FCC Rcd. 9109, 9110 ¶ 4 (*Stage II Order*). Together, they caused up to $90 billion in total damage. *Id.* After the storms, "88.8 percent of cell sites were out of service in Puerto Rico and 68.9 percent were out of service in the U.S. Virgin Islands," and "large percentages of consumers" lacked cable or wireline service. *Connect America Fund*, 32 FCC Rcd. 7981, 7981 ¶ 1 (2017) (*Immediate Relief Order*) (internal quotation marks omitted).

Recognizing that "[r]estoring and repairing communications networks [wa]s critical to bringing much needed immediate relief to these heavily damaged areas," in October 2017 the Commission allowed carriers in the

Territories to immediately receive the high-cost support subsidies they were scheduled to receive over the next seven months, totaling up to $76.9 million. *Id.* at 7981 ¶ 2, 7985 ¶ 14. The Commission planned to offset these funds against the carriers' future subsidies. *Id.* at 7985 ¶ 14.

The following May, the Commission found that restoration was proving slower and more expensive than anticipated due to "persistent power outages and other logistical challenges." *The Uniendo a Puerto Rico Fund and the Connect USVI Fund*, 33 FCC Rcd. 5404, 5407 ¶ 10 (2018) (*Stage I Order*). Accordingly, the Commission announced that the previous subsidy payments would not be offset, *id.*, and allocated an additional $64.2 million for further restoration, *id.* at 5408 ¶ 15. The Commission funded both measures with existing cash reserves it had accumulated in a "high-cost cash account" between 2012 and 2018. *Connect America Fund*, FCC 18-29, 2018 WL 1452720, at *21 ¶ 69 (Mar. 23, 2018) (describing high-cost cash account); *Wireline Competition Bureau Announces Stage I Restoration Funding for the Uniendo a Puerto Rico Fund and the Connect USVI Fund*, 33 FCC Rcd. 8044, 8045 (Wireline Comp. Bur. 2018) (announcing use of reserves). The Commission issued the *Stage I Order* without notice and comment, determining that such procedures would be "impracticable and contrary to the public interest." *Stage I Order*, 33 FCC Rcd. at 5411 ¶ 23.

Finally, the Commission sought comment on various proposals for more comprehensive relief that would protect the Territories' communication networks against future storms. *Id.* at 5413–14 ¶¶ 35–36, 5423–24 ¶¶ 81–82. That notice-and-comment process culminated in the 2019 issuance of the *Stage II Order*, which allocated another $934 million over the next decade for expanding networks in the Territories to underserved areas and making the networks more storm-

resistant. *Stage II Order*, 34 FCC Rcd. at 9110 ¶ 3, 9112–13 ¶ 8.

Petitioner Tri-County is a telecommunications carrier in Wyoming and Montana that contributes to the Universal Service Fund. It timely filed a petition for agency reconsideration of the *Stage I Order*, which the Commission denied in the *Stage II Order*. *See id.* at 9182–85 ¶¶ 154–61. Tri-County then timely petitioned for review of both orders.

## II.

We first consider whether Tri-County has Article III standing. To establish standing, Tri-County "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Tri-County claims that both orders caused it an injury in fact by increasing its required contributions to the Universal Service Fund. As the Commission acknowledges, this is sufficient to establish standing to challenge the *Stage II Order*: the Commission will finance that order by increasing future contributions to the Fund, including Tri-County's. *See Stage II Order*, 34 FCC Rcd. at 9137 ¶ 45.

That said, the Commission argues that the *Stage I Order* did not increase Tri-County's contributions because that order was financed with existing cash reserves rather than future contributions. Contrary to the Commission's argument, spending these reserves caused Tri-County an injury in fact. As the Commission acknowledges, the existing cash reserves were being used to finance initiatives within the high-cost program. *See* Resp'ts' Br. 11–12 (citing *Universal Service Contribution Methodology*, 34 FCC Rcd. 4143, 4145 ¶ 5 (2019)). Thus, if the Commission had not used the cash reserves to fund the

Territories' restoration efforts, that same money would have been used to offset some other high-cost funding demand in the future, which would have, all else being equal, decreased future funding obligations of Universal Service Fund contributors. In fact, the Commission announced in December 2018 that because there was "no excess cash in [the] high-cost account," it "w[ould] need to collect additional funds to meet the requirements of the high-cost program." *Connect America Fund*, 33 FCC Rcd. 11,893, 11,944 ¶ 182 (2018). Because the *Stage I Order* did in fact increase future contribution obligations of Tri-County, it has standing to challenge it.

Although Tri-County has standing to challenge the amount of subsidies authorized by the *Stage I Order*, it lacks standing to challenge the *Stage I Order*'s allocation of funds between Puerto Rico and the U.S. Virgin Islands. Taking the overall amount as given, the Commission's allocation had no effect on Tri-County's contributions and thus caused it no injury.

## III.

Tri-County brings three APA claims: first, that the Commission lacked good cause to forgo notice and comment for the *Stage I Order*; second, that the Commission failed to justify the overall funding level the *Stage I Order* provided; and third, that in both orders, the Commission changed its position on using the Universal Service Fund for disaster relief without adequate explanation. We reject all three arguments.

## A.

An agency may forgo notice and comment when it is "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. § 553(b)(B). This exception "is to be narrowly construed and only reluctantly countenanced," *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 93 (D.C. Cir. 2012) (internal

quotation marks omitted), and "the grounds justifying the agency's use of the exception should be incorporated within the published rule," *Tennessee Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1144 (D.C. Cir. 1992) (internal quotation marks omitted). We review de novo the agency's legal conclusion that good cause exists, and we defer to its factual findings unless they are arbitrary and capricious. *Sorenson Communications, Inc. v. FCC*, 755 F.3d 702, 706 & n.3 (D.C. Cir. 2014).

In the *Stage I Order*, the Commission determined that notice and comment would be impracticable and contrary to the public interest because most customers in the Territories still lacked reliable services and "the next hurricane season w[ould] commence on June 1, 2018." *Stage I Order*, 33 FCC Rcd. at 5411 ¶¶ 23–24. The Commission found that given the "emergency situation" in the Territories, providers needed to receive additional funds as soon as possible. *Id.* at 5411 ¶ 24. It also warned that "[d]elaying these funds could result in serious harm if carriers [we]re not able to restore and fortify their service before the start of the next hurricane season" because the public would be unable to contact first responders. *Id.*

Tri-County argues that the prospect of future hurricanes was too speculative to provide good cause. According to Tri-County, the upcoming hurricane season did not create a real emergency. But the Commission's good-cause justification did not depend on the prospect of a new hurricane. Rather, the Commission determined that there was an *ongoing* "emergency situation" in the Territories because most customers still lacked service at the time of the order, and "the sooner providers receive[d] additional funds, the sooner service c[ould] be restored." *Id.* at 5411 ¶ 24.

Still, Tri-County objects, the Commission could have acted earlier, and so the ongoing emergency was of its own making. We disagree. To be sure, agencies may not "simply wait . . . [and] then raise up the 'good cause' banner and promulgate rules without following APA procedures." *Council of the Southern Mountains, Inc. v. Donovan*, 653 F.2d 573, 581 (D.C. Cir. 1981). But this is not a case of unjustified agency delay. The Commission *did* act earlier, issuing the *Immediate Relief Order* within two weeks of Hurricane Maria's landfall. *Immediate Relief Order*, 32 FCC Rcd. at 7981 ¶ 1. The agency needed to act again in the *Stage I Order* because "persistent power outages and other logistical challenges ha[d] made the continued operation of restored networks more expensive than some expected." *Stage I Order*, 33 FCC Rcd. at 5407 ¶ 10. When carriers asked for more help, *id.* at 5406–07 ¶¶ 8–9, the Commission reasonably determined that an emergency continued to exist.

**B.**

Tri-County next claims that the Commission failed to justify the amount of funding it provided in the *Stage I Order*. In that order, the Commission first declined to offset the $65.8 million it had provided in the *Immediate Relief Order* because doing so would "substantially delay, if not prevent" those efforts. *Id.* at 5407 ¶ 10. It then set aside an additional $64.2 million, reasoning that an amount "roughly equal to the amount [it] ha[d] decided not to offset against existing support payments . . . should help restore and maintain service as quickly as possible for as many people as possible during th[e] interim period" before the *Stage II Order*. *Id.* at 5408 ¶ 14.

These explanations were perfectly reasonable. Requiring carriers to repay the funds they had already received would have delayed urgently needed restoration. And since the Commission could not know exactly how much more funding

would be needed, it sensibly drew on prior experience to provide roughly the same amount as before. *See AT&T v. FCC*, 886 F.3d 1236, 1252–53 (D.C. Cir. 2018) (finding that the burden to explain is relaxed when the Commission left existing levels in place for an interim period). The Commission also put oversight mechanisms in place to ensure that recipients spent the funds properly, which helped guarantee that any excess funds would not be disbursed. *Stage I Order*, 33 FCC Rcd. at 5410 ¶¶ 20–21.

Tri-County argues that the Commission's justification contradicted itself, claiming that the Commission decided to allocate additional support that was "'about equal' to the carriers' existing frozen high-cost support" but then dismissed the frozen high-cost support amount as irrelevant to its determination. Pet'r's Br. 25 (quoting *Stage I Order*, 33 FCC Rcd. at 9183 ¶ 158). That is incorrect: the Commission's number was equivalent to the emergency advance funds it had provided in the *Immediate Relief Order*, *not* to the carriers' frozen regular high-cost support. *See Stage I Order*, 33 FCC Rcd. at 5408 ¶ 14; *see also id.* at 5410 ¶ 22 ("[W]e are not allocating the new funding in proportion to frozen high-cost support"). Tri-County's claim that the Commission failed to make the "explicit empirical finding[]" that service had not been restored, Pet'r's Br. 27 (internal quotation marks omitted), is likewise inaccurate. *See, e.g.*, *Stage I Order*, 33 FCC Rcd. at 5407 ¶ 10 ("Restoration efforts are still ongoing rather than largely complete."); *id.* at 5411 ¶ 24 ("Even after months of recovery efforts, the majority of citizens in Puerto Rico lack access to continuous and reliable telecommunications services." (internal quotation marks omitted)).

**C.**

Tri-County next argues that the Commission changed its prior position without adequate explanation when it concluded that disaster relief was a purpose for which high-cost funds were intended under section 254(e) of the Communications Act. *See Stage I Order*, 33 FCC Rcd. at 5410 ¶ 20 (concluding that appropriate purposes under section 254(e) included addressing damages done "during the hurricanes"); *Stage II Order*, 34 FCC Rcd. at 9169 ¶ 118, 9149 ¶ 172 (same). According to Tri-County, the Commission had determined in its 2005 *Hurricane Katrina Order* that disaster relief was *not* a purpose for which high-cost funds were intended.

Tri-County mischaracterizes the Commission's earlier determination. In the *Hurricane Katrina Order*, the Commission stated that "using high-cost support to repair and rebuild facilities and services damaged by Hurricane Katrina [wa]s consistent with the statutory directive contained in section 254(e)." 20 FCC Rcd. 16,884, 16,912 ¶ 55 (2005). As Tri-County points out, the Commission also "[a]lternatively" forbore from section 254(e) and waived its implementing regulation "[t]o the extent necessary and for only the relief provided herein." *Id.* But it did so only in the alternative. Thus, since the Commission took the position in the *Hurricane Katrina Order* that disaster relief *was* an eligible purpose under the Communications Act, and it maintained that position in the *Stage I* and *Stage II Orders*, no change in position occurred.

**IV.**

Tri-County also challenges both orders under the Communications Act. It argues that the Commission contravened various sections of the statute by using high-cost funds for disaster relief, a purpose for which it alleges the funds are not intended, and by failing to consult the Federal-State

Joint Board before issuing the orders. These claims also lack merit.

**A.**

Section 254(b) of the Communications Act sets out six principles to guide the Commission's universal service policies. 47 U.S.C. § 254(b). The Commission receives *Chevron* deference in interpreting these principles and has "broad discretion" in balancing them. *Rural Cellular Ass'n v. FCC*, 588 F.3d 1095, 1101–03 (D.C. Cir. 2009) (citing *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843 (1984)).

In support of its argument that the *Stage I* and *Stage II Orders* misused high-cost funds, Tri-County appeals to two specific 254(b) principles. First, it argues that the orders contravened the principle that "rural, insular, and high cost areas[] should have access to . . . services . . . that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas." 47 U.S.C. § 254(b)(3). According to Tri-County, the Commission "erroneously focus[ed]" on restoring comparable services rather than on ensuring both comparable services *and* rates. Pet'r's Br. 41. But nothing in the statute's language requires that each of the Commission's actions "focus" on both rates and services. In any case, the orders met such a requirement, because to ensure that an area has access to comparable services and rates, the Commission must ensure that it has *some* services to begin with. Tri-County also argues that the Commission may use the Universal Service Fund only to preserve services that already exist, not to create new services. *Id.* at 43. But the Communications Act is to the contrary: it provides that the Commission's "policies for the preservation *and advancement* of universal service" should

support consumers in high-cost areas. 47 U.S.C. § 254(b) (emphasis added).

Second, Tri-County appeals to the Communications Act's principle that universal service mechanisms be "predictable and sufficient." *Id.* § 254(b)(5). Tri-County argues that the orders violated the predictability part of this principle because "[h]urricanes are by their very nature unpredictable." Pet'r's Br. 14. This inference does not follow. Even if it is hard to predict a particular hurricane, it is predictable that some hurricanes will periodically disrupt service in a hurricane-prone region. Moreover, as the Commission points out, the Commission established these funds with set ceilings for their disbursement over defined periods of time, thereby satisfying the predictability requirement. Resp'ts' Br. 34 n.10. Tri-County also argues that the *Stage I* and *Stage II Orders* violated the same principle by providing excessive funding, which "may itself violate the sufficiency requirements of the Act by . . . pricing some consumers out of the market." *Rural Cellular Ass'n*, 588 F.3d at 1103 (internal quotation marks omitted). But Tri-County offers no evidence that the subsidies authorized by the orders priced any consumers out of the market.

**B.**

Tri-County finally argues that the orders violated the Act's requirement that the Commission "institute and refer to a Federal-State Joint Board . . . to recommend changes to . . . the definition of the services that are supported by Federal universal service support mechanisms." 47 U.S.C. § 254(a)(1). According to Tri-County, the Commission changed the definition when it used the Universal Service Fund for the supposedly new and distinctive purpose of "disaster relief." Pet'r's Br. 32.

We reject this premise. As noted, the Commission had previously used the Universal Service Fund for disaster relief in the *Hurricane Katrina Order*. And in the two orders at issue here, the Commission simply applied the principles in section 254(b) to the circumstances found in the Territories. The statute contains no special carve-out for natural disasters, and Tri-County offers no principled distinction between a hurricane and any other cause of lost service. At oral argument, Tri-County's counsel stated that the Commission may use the Universal Service Fund when "the economics are not working," such as when a supplier goes bankrupt. Oral Arg. Rec. 20:09. This line fails to distinguish the orders because the economics of providing service were "not working" in the Territories after the hurricanes, either. Given that the orders did not change the definition of the services supported by the Fund, the Commission was not required to consult the Joint Board.

## V.

For the foregoing reasons, the petition for review is denied.

*So ordered.*